UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re the Application of NATALIA POTANINA

For an Order to Take Discovery Pursuant

to 28 U.S.C. § 1782(a)

Civil Action No. 14MC 0031 (JGK)

## DECLARATION OF NATALIA POTANINA
## IN SUPPORT OF APPLICATION UNDER 28 U.S.C. § 1782(a)

**NATALIA POTANINA** declares as follows pursuant to 28 U.S.C. § 1746:

1. I am a Russian citizen currently residing in the United States, and I make this declaration in support of my application for discovery pursuant to 28 U.S.C. § 1782 for potential use in a pending divorce action in the Presnensky District Magistrate Court in Moscow, Russia (the "Moscow Court"), initiated by my husband, Vladimir Potanin.

2. There has been no agreement between me and my husband concerning the division of marital assets or any other issue related to the divorce proceeding. My husband has told me that unless I voluntarily accept his oral promises regarding support, he will make sure that I receive nothing. I consider his terms grossly unfair.

3. I speak and understand English and have prepared this declaration in English with the help of English-speaking individuals.

4. The facts set forth in this declaration are personally known to me and are true to the best of my knowledge, information and belief.

**Background:**

5. My husband Vladimir Potanin is considered to be one of the ten richest individuals in Russia, and his net worth has been recently estimated to exceed $14,000,000,000

(fourteen billion dollars). *See, e.g.,* the Forbes.com profile of Vladimir Potanin, available at http://www.forbes.com/profile/vladimir-potanin/, a true and correct copy of which is attached hereto as Exhibit A.

6. Vladimir and I met while we both attended secondary school in Moscow, and we were married in Moscow on March 15, 1983. We have three children together, aged twenty-nine, twenty-four and fifteen.

7. Vladimir graduated from the Faculty of International Economic Relations at the Moscow State Institute of International Relations (MGIMO) in 1983. I earned an economics degree (equivalent of an MBA in the U.S.) in 1983 from the Moscow Institute of Transport and Engineering.

8. At the time of our marriage, neither Vladimir nor I owned any significant assets. For the first seven years of our marriage, until at least 1990, we lived together in my parents' home. Our first two children were born in 1984 and 1989. During the 1980's, Vladimir and I both worked to support our family. Vladimir worked in the USSR Ministry of Foreign Trade from 1983 to 1990, while I worked as an economist at the USSR Ministry of Building and Construction.

9. In March 1990, Vladimir founded the Interros Company ("Interros"), and thereafter we began experiencing significant success in business.

10. Since 1990, through numerous acquisitions and reorganizations, Interros has grown into a company of global scope, worth billions of dollars.

11. I supported Vladimir in his various enterprises and efforts throughout the 1990's and 2000's. I was employed by Interros subsidiaries and was also an officer in Interros companies. I always received a nominal salary, because I have always considered myself a co-

owner of Interros and all its subsidiaries through my marriage to Vladimir. A record of my employment history is set forth in my Russian work certificate. True and correct images of my work certificate and translations thereof are attached hereto as Exhibit B. From February 2001 through June 2007, I was the President of "Interros Estate", an Interros subsidiary that was a real estate holding and management company for properties in and around Moscow.

12. I have been involved with Vladimir's business dealings since we were married in 1983, and he consulted with me and sought my advice, which I gladly provided. Beginning in 2007, coinciding with the beginning of his separation from his business partner, Mr. Prokhorov, I believe Vladimir began withholding from me information concerning his business dealings.

13. In addition to my professional responsibilities, I have also at all times taken primary responsibility for raising and caring for my and Vladimir's three children.

**The Russian Divorce Proceeding:**

14. On or about November 17, 2013, Vladimir informed me of his intent to divorce me. He asked me to sign legal documents indicating that I did not oppose divorce and that we had no disagreements concerning the division of marital property, so that our marriage could be dissolved by an administrative agency rather than through a court proceeding. I did not want Vladimir to divorce me, but I understood I could not change his mind, and so I agreed to discuss terms with him.

15. I told him on November 17 that I believed I was entitled to half of our marital property, which I believe includes his ownership interests in Interros, any other companies he owns, and all of the other items and assets that he has ownership of or in which he holds interests, directly or indirectly. In response, Vladimir told me that he did not intend to share any assets with me. He told me that he would be the judge of what I needed and would provide accordingly. He therefore promised that he would (a) transfer title to the family home to my

name; (b) pay for medical expenses for me and our youngest son, who is fifteen; (c) pay for the education of our youngest son; and (d) pay for security and protection for me and our youngest son. Vladimir told me that if I refused his offer, I would get nothing.

16. Vladimir's limited promises to provide for me did not include a guarantee that they would remain in effect for any length of time. I asked Vladimir to put in writing what he proposed, but Vladimir refused to put anything in writing. He told me again that if I refused his oral offer, I would get nothing. I rejected his offer. In response, Vladimir told me that I would never be able to prove that he had any assets.

17. Vladimir knew I would be traveling to New York City on November 23, 2013, to undergo scheduled surgery. He also knew that, after my surgery, I would be unable to fly again for a period of at least four weeks. When Vladimir and I concluded our discussions on November 17, I understood and expected that nothing had been decided, that Vladimir would take no immediate action, and that we would resume discussion of how to handle the divorce upon my return to Russia after I had recuperated from my surgery. I also expected that Vladimir would take no immediate action because our youngest son was to sit in December for his entrance exams to attend school in the United States. Vladimir and I had agreed more than a year prior to move to the United States so that our youngest son could attend a U.S. school and had previously visited the U.S. together to look for a home and school.

18. On the evening of Friday, November 22, 2013, Vladimir's chief of security came to my home and handed me a summons for a divorce proceeding. The summons bore no docket number. Unbeknownst to me at the time, I now understand that Vladimir filed for divorce at the Moscow Court on November 21. As part of his filing, Vladimir incorrectly asserted that there

was no dispute regarding the division of marital assets. I now believe that Vladimir had been planning all along to quickly push through our divorce while I was in New York for my surgery.

19. As of the morning of November 23, I had not consulted with an attorney concerning a potential divorce because I had not expected any imminent action on Vladimir's part. On the morning of November 23, in the few hours before I departed, I executed a power of attorney for my nephew and tasked him with hiring a lawyer to represent me in the divorce proceeding in the Moscow Court.

20. My nephew was able to hire an attorney to appear in court on my behalf. A preliminary scheduling conference was set for December 2, 2013, at which time my Russian attorney appeared and informed the Moscow Court that I was out of the country, having recently undergone surgery, that he had no specific instructions from me because he had not been able to consult with me prior to his appearance, and he requested that the Moscow Court adjourn proceedings. Vladimir's attorney pressed for a hearing and a final decision on the divorce at the earliest possible date. The court scheduled a hearing for December 25, 2013.

21. My Russian attorney appeared again on December 25. Vladimir's attorneys repeatedly insisted at the December 25 hearing that there were no issues for the court to address and requested that the court immediately issue a divorce decree. My attorney asserted that I contest the divorce and that Vladimir and I have not reached any agreement concerning the division of our marital property. The court agreed to adjourn the hearing for an additional period of two months, until February 25, 2014.

**Vladimir Potanin's Assets and the Need for Discovery in the United States:**

22. I lack specific information concerning the full extent and value of all the property and assets held or owned by my husband and which were acquired during the time we were married. However, I know that he is the sole owner of Interros, and I have knowledge and

information indicating that he is the owner of numerous other companies either directly or indirectly through Interros. True and correct copies of Interros English-language website pages are attached hereto as Exhibit C. The website indicates that Interros and its many subsidiaries are the primary holding companies for the great majority of Vladimir's companies, investments and assets. The Interros website describes Interros as "one of the largest private investment companies in Russia" (http://www.eng.interros.ru/about/), identifies Vladimir Potanin as the "President and Owner" of Interros (http://www.eng.interros.ru/team/) and notes that, since February 2008, Vladimir is the "sole owner of the Interros Company" (http://www.eng.interros.ru/about/founder/).

23. I also believe that Vladimir and Interros own or control significant assets within the United States and elsewhere in the world, although the value and precise location of those assets is not clear to me. I anticipate that Vladimir will continue to claim that he has no assets, and I require evidence to oppose this claim. I request the assistance of United States courts to make an investigation of Vladimir's assets, so that I can be prepared for marital separation proceedings.

24. The subpoenas proposed by my application seek depositions and production of documents from individuals and corporate entities (the "Discovery Respondents"), each of which I expect to have documents and information regarding the current or former locations of (and amounts of) Interros' and Vladimir's assets. I seek these subpoenas for the purpose of obtaining evidence so that I will be prepared for proceedings concerning the division of our marital property. Specifically, I seek discovery from the following Discovery Respondents who reside or may be found in the Southern District of New York:

(a) Altpoint Capital Partners, LLC ("Altpoint");

(b) Guerman Aliev, the Chairman and CEO of Altpoint, who is also listed as a Vice-President of Interros on the Interros website (*see* Exhibit C);

(c) Brett Pertuz, an Altpoint managing director;

(d) Anish Sheth, an Altpoint principal;

(e) Derek Pease, Altpoint's General Counsel and CCO and an Altpoint principal;

(f) Stone Tower Capital LLC; and

(g) Apollo Global Management LLC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 30, 2014 in New York, New York.

Natalia Potanina