```
     E4N9POTC

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   NATALIA POTANINA,

 4              Petitioner,

 5         v.                                   14 MC 31

 6   ALTPOINT CAPITAL PARTNERS, LLC
     GUERMAN ALIEV, DEREK PEASE,
 7   BRETT A. PERTUZ, ANISH SHETH,
     ERIC CHAN AND PRABHKIRAT
 8   (YUKI) NARULA,

 9              Respondents.

10   ------------------------------x
                                                New York, N.Y.
11                                              April 23, 2014
                                                10:48 a.m.
12
     Before:
13
                       HON. KIMBA M. WOOD
14
                                                District Judge
15
                             APPEARANCES
16
     ALSTON & BIRD
17        Attorneys for Petitioner
     BY:  KARL GEERCKEN
18        AMBER WESSELS-YEN

19   DEBEVOISE & PLIMPTON
          Attorneys for Respondents
20   BY:  JOSEPH MOODHE
          STEVEN MICHAELS
21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

1           (In open court; case called)
2           MR. MOODHE:  Good morning, your Honor.
3           Joseph Moodhe of Debevoise & Plimpton for respondents.
4   Together with me today is Steven Michaels from my firm.
5           THE COURT:  Your name is Joseph.
6           MR. MOODHE:  Moodhe M-O-O-D-H-E.
7           THE COURT:  Thank you.
8           MR. GEERCKEN:  Good morning.  My name is Carl
9   Geercken.  I'm from Alston & Bird.  We represent the
10  petitioner, Mrs. Potanina.  With me is my partner, Amber
11  Wessels-Yen.
12          THE COURT:  How do you do.
13          Have you agreed on who will speak first?  I think I
14  should hear from Altpoint first if you haven't.
15          MR. MOODHE:  That's fine, your Honor.  Thank you.
16          Your Honor, we requested this premotion conference
17  today after we had submitted a request to adjourn the motion to
18  quash, which was granted by Judge Sweet, and adjourned that to
19  May 6.  We did so because we believed there was a serious
20  question of a potential disqualification of Alston & Bird in
21  this proceeding.
22          THE COURT:  How did you gain the information about how
23  much information Mr. Aliev gave Alston & Bird?
24          MR. MOODHE:  Well we don't know precisely what
25  information was given.

1      THE COURT:  What is your source?

2      MR. MOODHE:  Mr. Aliev as well as the engagement

3  letter that was entered into between Alston & Bird and

4  Mr. Aliev.  In that engagement letter it is specifically

5  recited that Alston & Bird had received information from

6  Mr. Aliev's private banking personnel about his personal

7  finances.  We don't know exactly what the nature of that

8  information was, but it was confidential information that

9  Mr. Aliev authorized be provided to Alston & Bird.

10      THE COURT:  Now, please tell me what is the most

11  important information you seek from Mr. Aliev?

12      MR. MOODHE:  I'm sorry, your Honor?

13      THE COURT:  I'm sorry.  It's the --

14      MR. GEERCKEN:  Your Honor, thank you.

15      We're seeking information from Mr. Aliev concerning --

16  information that can be used in a Russian divorce proceeding.

17  My client --

18      THE COURT:  All I want to know is what is the

19  information.

20      MR. GEERCKEN:  Information about the assets and

21  holdings.

22      THE COURT:  Whose?

23      MR. GEERCKEN:  Of Vladimir Potanina.

24      THE COURT:  How does Mr. Aliev happen to have that

25  information?

1          MR. GEERCKEN:  Mr. Aliev is an officer of Altpoint
2    which is an entity that is owned by -- either directly or
3    indirectly by Mr. Potanina or a Mr. Potanina entity Interros.
4    We have spoken with our client about Altpoint.  And they
5    believe that my client, Mrs. Potanina, believes that Mr. Aliev,
6    Altpoint and other representatives of Altpoint have information
7    that would help her ascertain what assets and holdings
8    Mr. Potanina has so she can use that for these Russian marital
9    estate separation proceedings.
10          THE COURT:  I understand.
11          Now, if you obtain the discovery you want, will you be
12    asking Mr. Aliev anything about his own personal finances?
13          MR. GEERCKEN:  No, your Honor.
14          THE COURT:  Then I don't see the problem.
15          MR. MOODHE:  Well, there's a fundamental misconception
16    on the part of Mrs. Potanina.  It is Mr. Aliev, who has a
17    controlling interest in Altpoint -- he owns 89 percent of the
18    firm -- therefore, by inquiring into Altpoint's assets on the
19    theory that they actually belong to Interros or indirectly to
20    Mrs. Potanina, the husband.  What they are actually trying to
21    do is to make a case through this discovery that these assets
22    actually don't belong to my client or to the funds that hold
23    them but they actually belong to the marital estate.  And the
24    theory is that they have cooperated to hide assets to frustrate
25    the divorce proceeding.

1  THE COURT: Who has cooperated? Who is the "they"?
2  MR. MOODHE: Altpoint, my client, any number of people
3  who may be affiliated executives with Altpoint are accused
4  fundamentally --
5  THE COURT: Including Aliev?
6  MR. MOODHE: Yes, your Honor.
7  The theory of the petitioner's case is not that we're
8  here to find information. We're here to find information to
9  establish that these assets really don't belong to the people
10  who claim to own them but they actually belong to the marital
11  estate. And so there is a direct adversity of interest between
12  Mr. Aliev, who claims for instance to have a controlling
13  interest in the firm, and petitioner who claims wherever those
14  assets may be nominally, they actually belong in the estate of
15  the marital estate. So there's a direct conflict and a direct
16  overlap between proving the two things.
17  THE COURT: I've heard that point. Okay.
18  Now, in representing Mr. Aliev did your firm learn
19  anything about Altpoint?
20  MR. GEERCKEN: To my knowledge, no, your Honor.
21  If I may I will give you a little bit of background on
22  the representation of Mr. Aliev.
23  THE COURT: Yes.
24  MR. GEERCKEN: My understanding is that he engaged the
25  firm on May 20, 2011. At that time we had one trusts and

1   estates partner in the New York office.  His name is Glenn Fox.
2   And Glenn is the one that drafted the engagement letter.  And
3   the engagement letter, as I understand it, identified the scope
4   as to be the counsel to Mr. Aliev with respect to drafting his
5   will, power of attorney, and healthcare proxy.
6           The work that was performed was performed between
7   May 4, 2011 and June 29, 2011.  An invoice was issued by
8   Mr. Fox on or about July 22, 2011 for $12,615 and change.  Our
9   ledger history indicates that the bill was paid in full on
10  August 17, 2011.  I'm not aware of any information that was
11  provided to Mr. Fox in connection with this representation.
12          No additional work -- there is no indication that any
13  additional work was performed for Mr. Aliev since that May 4 to
14  June 29, 2011 time period.
15          Mr. Fox departed Alston & Bird late in 2012.  We no
16  longer have any trust and estates attorney resident in the
17  New York office.
18          THE COURT:  Do you have a copy of Mr. Aliev's will at
19  your office?
20          MR. GEERCKEN:  I believe that it is in our safe and we
21  have advised opposing counsel that we're happy to turn over the
22  entire file to them and to Mr. Aliev.  We have no objection to
23  that.
24          THE COURT:  In other words, you're willing to turn
25  over anything your firm has with respect to Mr. Aliev?

1          MR. GEERCKEN:  That's correct, your Honor.  And those
2    materials were kept in records and I do not have access to
3    them.  I have not seen them.
4          THE COURT:  Now is there anyone left at your firm who
5    worked on the Aliev matter?
6          MR. GEERCKEN:  Yes, your Honor.  There is one
7    individual, a second year associate by the name of Michael
8    Igyarto.  Michael was a summer associate at the time.  I did
9    not know that he did any work in connection with the Aliev
10   matter.  In reviewing the bill I see that Michael spent nine
11   hours working on a memo regarding redemption issues under
12   New York law.
13         When we found out that Michael did some research, we
14   advised him that he shouldn't do any other work in connection
15   with the Potanina matter.  Glenn Fox was his summer associate
16   mentor and it looks like it's just a research assignment.
17         THE COURT:  Had he worked on the Potanina matter?
18         MR. GEERCKEN:  He had done basic research on the 1782
19   proceedings for purposes of establishing the basic legal
20   requirements for getting 1782 relief.  He has not reviewed any
21   files relating to Mr. Aliev or Altpoint as none of those
22   materials have been turned over to us.
23         THE COURT:  Is there any possibility that he used any
24   information he gained from working on an Aliev matter in
25   connection with his work for Ms. Potanina?

1  MR. GEERCKEN:  No, your Honor, I don't believe so at
2  all.  In fact, when we advised him of this he said:  I don't
3  even remember the name Mr. Aliev and I don't remember the memo.
4  THE COURT:  All right.
5  Looking now to Mr. Moodhe.  The discovery you seek is
6  largely going to be turned over to you.  And I think you've
7  just learned the balance of the information you need.
8  Do you need anything else?
9  MR. MOODHE:  Well, your Honor, what I've heard
10 disturbs me a little bit.  This is new information to us, that
11 an associate who has been actively involved in the
12 representation of petitioner and has actually participated in
13 phonecalls with our office actually worked on Mr. Aliev's will
14 and trust documents.  I'm not sure exactly what the redemption
15 issue he researched was.  But, obviously, he had access to
16 Mr. Aliev's personal information.
17 THE COURT:  Let's do this.  Why don't you work out the
18 wording of an affidavit that you would obtain that Alston &
19 Bird would obtain from that associate that would satisfy you
20 that no information from Mr. Aliev has been shared with anyone
21 working on the Potanina matter.
22 MR. MOODHE:  I'm not sure that I can commit upfront to
23 working out an affidavit that would satisfy --
24 THE COURT:  You don't have to commit to it but try to
25 do it and then come back if you can't succeed.

1            MR. MOODHE:  Your Honor, I will do that.

2            But I also would like to have the information we
3    requested in our letter disclosed to us.  There is a second
4    issue here, not just of successive representation, but of
5    concurrent representation.

6            Mr. Aliev, his will and trust documents, the originals
7    remain with Alston & Bird.  And Mr. Aliev considers them to be
8    his attorneys.

9            Now, this is a little different than a litigation that
10   has an endpoint or transaction that has an endpoint.  Trust and
11   estate planning is organic.  And, frankly, the reason that we
12   are concerned about this is because we have seen on Alston &
13   Bird's website invitations to clients to come back and update
14   and refresh their will, as most people would do every couple of
15   years.

16           THE COURT:  When was the most recent viewing of that
17   website that said that?

18           MR. MOODHE:  There are memos that are posted on the
19   website today.

20           THE COURT:  That say that that firm will update trusts
21   and estates matters?

22           MR. MOODHE:  There are memos that are from earlier
23   periods but are still on the website in their wealth management
24   planning area.  And there is a partner who does wealth
25   management planning still at the firm.  They post these memos

1  to clients that invite people and encourage people to come back
2  and talk to them about updating their wealth planning.
3          THE COURT:  Does Mr. Aliev have any desire to go back
4  to Alston & Bird to update his wealth management planning?
5          MR. MOODHE:  Oddly you should ask that because the
6  reason we discovered the conflict, frankly, was that Mr. Aliev
7  was prepared to go back to Alston & Bird.  He has recently been
8  involved in a matrimonial action of his own and is nearing the
9  end of that and actually retrieved his will with the prospect
10 that he might have to go back and make some changes.  And it
11 was at that time that he made the connection that the firm that
12 was representing petitioner here was the same firm that had
13 worked on his will.
14         THE COURT:  That didn't answer my question.
15         MR. MOODHE:  Would he go back now?
16         THE COURT:  Yes.  Does he wish to go back now?  Does
17 he wish to continue the relationship?
18         MR. MOODHE:  Well I don't know, your Honor.  I haven't
19 posed that question to him since he found that they were
20 adverse to him in his interests.
21         THE COURT:  Why don't you check that out.  He may not
22 want to go back given that Glenn Fox is no longer there or he
23 may want to go back.  I'll hear you again once you've tried to
24 work that part out.
25         MR. MOODHE:  Yes, your Honor.

E4N9POTC

1            THE COURT:  Thank you very much.
2            MR. MOODHE:  One question.  Will I be able to get the
3    additional information that was requested in our letter?
4            THE COURT:  Not yet.  Wait and see how the affidavit
5    goes.
6            MR. MOODHE:  Okay.
7            THE COURT:  Thank you.
8            MR. MOODHE:  Thank you, your Honor.
9            (Adjourned)