F6HAPOTHps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:
                                        14-MC-31
4   APPLICATION OF NATALIA POTANINA      14-MC 57

5   ------------------------------x

6                                        New York, N.Y.
                                         June 17, 2015
7                                        10:10 a.m.

8

    Before:
9
                        HON. LORETTA A. PRESKA
10
                                         District Judge
11

12                          APPEARANCES
    ALSTON & BIRD LLP
13        Attorneys for Petitioner Natalia Potanina
    BY:   KARL GEERCKEN, ESQ.
14        AMBER WESSELS-YEN, ESQ.
          ALEXANDER S. LORENZO, ESQ.
15        MATTHEW C. DECKER, ESQ.

16  PROSKAUER ROSE LLP
          Attorneys for Respondent Guerman Aliev
17  BY:   MICHAEL A. CARDOZO, ESQ.
          MARGARET A. DALE, ESQ.
18        LINDSEY A. OLSON, ESQ.

19

20

21

22

23

24

25

F6HAPOTHps

1          (In open court)

2          THE COURT:  Is counsel for petitioner ready?

3          MR. GEERCKEN:  Yes, your Honor.  Karl Geercken from

4     Alston & Bird on behalf of the petitioner, Natalia Potanina.

5          THE COURT:  Good morning.  Counsel for Mr. Aliev.

6          MR. CARDOZO:  Michael Cardozo, Proskauer Rose.

7          THE COURT:  How does your client pronounce his name,

8     please?

9          MR. CARDOZO:  Mr. Aliev.

10          THE COURT:  Aliev.  Thank you so much.

11          Counsel, would you like to give me some idea of how

12     you want to proceed, please.  Mr. Aliev is going to go first,

13     right?

14          MR. GEERCKEN:  I was thinking, your Honor, that we

15     were going to give a short opening statement, and I would leave

16     it up to Mr. Cardozo if he would like to follow with an

17     opening, and then we could take testimony from Mr. Aliev.  We

18     have not discussed whether Mr. Cardozo wanted to put him on the

19     stand on his motion for reconsideration first, or whether we

20     should just begin with a cross of him.  I am prepared to begin

21     with a cross of Mr. Aliev.

22          THE COURT:  Which probably is what we should do,

23     right?

24          MR. CARDOZO:  I would suggest, your Honor, as I

25     understand it, you have granted the motion for reconsideration,

1    the motion --

2              THE COURT:  That's what we're doing now.

3              MR. CARDOZO:  The question is now, does he or does he

4    not have control.  And so I agree with brief opening statements

5    from each side following by calling Mr. Aliev to the stand.  I

6    would think the most efficient way is for me to then follow

7    with the cross and then whatever redirect there may be.

8              THE COURT:  Right.  OK.  And I know --

9              MR. CARDOZO:  Excuse me, your Honor.

10             THE COURT:  Go ahead.

11             MR. CARDOZO:  And then in the course of things I think

12   we'll handle all the exhibits.  We've been able to resolve most

13   of the issues.  And then maybe at the end, maybe a little

14   mop-up with other exhibits.

15             THE COURT:  OK.  Also, I don't see any reason for you

16   to take the time to read into the record all that deposition

17   testimony.  I have the designations and the objections, and we

18   can read it ourselves just as well.

19             All right.  So that sounds like a plan.

20             Would you like to start.

21             MR. GEERCKEN:  Absolutely, your Honor.  Would you like

22   me to start over by the podium?

23             THE COURT:  Anyplace you want to be, anyplace you're

24   comfortable with is fine with me.

25             MR. GEERCKEN:  Well, that's kind of you, your Honor.

F6HAPOTHps                    Opening – Mr. Geercken

1     I'll start right here, then.

2             Thank you, your Honor, for making yourself and the

3     court available to us.  As you know, we represent the

4     petitioner, Natalia Potanina, in connection with the 1782

5     matter.

6             The sole issue, as you have said, your Honor, before

7     the Court today is whether Mr. Aliev has control over the

8     documents that he was ordered to produce back in June of last

9     year.  Mr. Aliev is here on a motion for reconsideration, and

10    he bears a heavy burden to overcome the Court's prior rulings

11    with respect to this matter.  He has to come forward with new

12    evidence.  What we have seen and what we will I think

13    demonstrate today is that Mr. Aliev has come forward with the

14    same argument, that he just does not have control, he does not

15    have access to.  And he has not come forward with new evidence

16    that shows that he does not have the legal right or control or

17    access to the documents and information he was ordered to

18    produce.  In fact, we believe that the evidence that has been

19    produced and that is now being submitted before your Honor

20    today will demonstrate that petitioner's argument has only

21    become stronger.  And we'll demonstrate that Mr. Aliev has the

22    legal right and/or ability to access information that is

23    responsive to the materials that he was ordered to produce.

24            Your Honor, I think the evidence will show, and I

25    won't get into too much detail, but I think the evidence today

1    will show that Mr. Aliev remains a vice president of Interros

2    and that he was directed to perform certain representative

3    functions of the company in connection with foreign investors

4    and funds since August of 2010.  We believe that now we have

5    certain new evidence, we have a regulation that defined the

6    scope of his authority and defined what his obligations and

7    rights as a vice president were.  And the regulation makes very

8    clear, in Section 3.3, that the vice president shall among

9    other things represent the company in relations with public

10   authorities, which we submit include courts and U.S. courts.

11   And we submitted expert testimony on that.  And indeed you'll

12   note that our expert, Mr. Kulkov, included that in his expert

13   report and testified to that.  I think it's at paragraph 22 of

14   his report.  And while the opposition expert took issue with

15   some aspects of Mr. Kulkov's report, he did not raise any issue

16   with respect to Mr. Kulkov's opinion as to the vice president's

17   role and responsibility to represent the company with public

18   authority.

19        Also, Section 3.3 of the regulation makes clear that

20   the vice president shall participate -- and the word is

21   "shall" -- participate in negotiations with major

22   counterparties and parties in Russia and abroad.  And we have

23   elicited expert testimony that even if, assuming arguendo that

24   Mr. Aliev really didn't doing anything right now, as he

25   contends, the expert for Mr. Aliev conceded that if he were to

F6HAPOTHps                    Opening - Mr. Geercken

1    engage in a negotiation with a major counterparty, he would

2    possibly need access to non-public confidential information.

3         Now, interestingly, the regulation is also in accord

4    with Russian law.  You may have seen in the expert reports that

5    the experts talk about Article 22 of the Russian Labor Code.

6    And that provides, in essence, that an employer must provide an

7    employee with all the necessary equipment, instruments, and

8    documents that are needed to perform his duties.

9         3.5 of the regulation says vice presidents of the

10   company have the right to receive necessary information and

11   documents about the activities of the company.  And they can

12   give the employees mandatory instructions that are aimed at

13   exercising their authorities.

14        So we think that this evidence and other evidence that

15   we'll discuss demonstrates that control and access to the

16   documents is available to Mr. Aliev and that he does have a

17   legal right to these documents.

18        We will also show, I think, that Mr. Aliev did not

19   take diligent steps to obtain the information and seek to

20   obtain the information at issue.  As the Court knows, the

21   order, the initial order in this case directing him to provide

22   the documents at issue was in June of last year.  There was no

23   activity in response to that.  It was only in October of last

24   year when the Court had to reconfirm its order that Mr. Aliev

25   began to take certain actions.  And at that time we submit that

1   he went to management, he went to those people that were

2   beholden to Mr. Potanin and that had to report, either directly

3   or indirectly, to Mr. Potanin, and he got the answer that he

4   expected to receive.  And he likewise went to Mr. Potanin, who

5   is an interested party in the dispute with his wife,

6   Mrs. Potanina, and got that same rejection.

7           THE COURT:  To whom would you suggest he should have

8   gone?

9           MR. GEERCKEN:  It's our position, your Honor, that he

10   could have and should have gone to employees of the company

11   that would have been able to give him access to e-mail and give

12   him access to other documents.  Under 3.5, if he wanted to get

13   information relating to foreign investments of Interros, all he

14   had to do was ask an employee.  Now, he will say, I did not

15   have any interaction with anybody from Interros in my role as

16   vice president.  I think he's going to have to admit that

17   Altpoint interacts with Interros every day.  He well understood

18   individuals within the organization could have gotten him

19   access to this information.

20           Now, it is true, your Honor, that had this come up to

21   Mr. Potanin, I suspect that Mr. Potanin may have, if he became

22   aware of it, tried to shut it down.  But we've cited authority

23   that makes clear that where companies try to do this, that is

24   not appropriate.  The *IBM* case that we have cited made clear

25   where a company went to the length of issuing a resolution

1    saying that the individual in question cannot get access to any

2    information, the court found that that was improper and

3    directed compliance with the subpoena and award.

4            THE COURT:  What happened next?  Forgive me for not

5    having followed the entire case, but what happened next?  Was

6    the employee locked up or what?

7            MR. GEERCKEN:  I don't believe the case discussed it.

8    I'm looking to Ms. Wessels.  I don't know if you recall --

9            THE COURT:  I know that look down the table.

10           MR. GEERCKEN:  Yes.

11           THE COURT:  You can tell me later.

12           MR. GEERCKEN:  Yes.  I'm not quite sure that it's

13   clear from the case, but Ms. Wessels or I will let you know.

14           All right.  So in short what we're saying is that

15   Aliev, his access to information, his right to information is

16   not subject to the whims of Interros or Mr. Potanin.  It's

17   governed by well-settled jurisprudence.  Does he have the legal

18   right or ability to obtain the documents in question?  If he

19   does, he should be ordered to produce.

20           What I'll finish with is that it is clear that the

21   regulation, the contract, Article 22, there is agreement by the

22   experts that these are the controlling documents and

23   controlling information relating to the issue in question.

24   And, your Honor, I respectfully submit that they demonstrate

25   that Mr. Aliev continues to have the legal right to obtain the

F6HAPOTHps                    Opening - Mr. Geercken

1    information in question and should be compelled to produce that

2    information in accordance with your prior order.

3              THE COURT:  Would you talk to me about how you see the

4    burden of proof at this stage.  A motion to reconsider has been

5    granted and that's what we're doing here.

6              MR. GEERCKEN:  Right.

7              THE COURT:  So now where are we?  I mean, in the

8    ordinary course, I think the petitioner would have the burden

9    of demonstrating the respondent's ability to respond.  Right?

10             MR. GEERCKEN:  I think that's right, your Honor.  In

11   the ordinary course a petitioner seeking production of the

12   information, we assume, has the burden of showing that there's

13   a legal right or ability to obtain the information.  And we

14   believe the evidence demonstrates that.  What I'm bringing up

15   with respect to the motion for reconsideration is that the only

16   new evidence that they're bringing up with respect to this

17   matter is an assertion that their counsel made back in May and

18   June of last year.  He just doesn't have access, he doesn't

19   have, he can't get the information.  We talked about that.  We

20   discussed a website at that point that showed that he was a

21   vice president and only vice president of the company.  We

22   talked about jurisprudence under U.S. law that makes clear that

23   officers of the corporation do have the right to obtain

24   information of the company.  And we have now determined under

25   Russian law that where there is an officer of the company, he

1  is entitled to obtain information that is relevant to his

2  duties.  So it's similar to the United States.  And I think the

3  same result should obtain.

4          THE COURT:  All right.  Thank you.

5          MR. GEERCKEN:  Thank you, your Honor.

6          THE COURT:  Mr. Cardozo.

7          MR. CARDOZO:  Thank you, your Honor.  I would like to

8  start by pointing out that in your January 9th opinion, you

9  granted the motion for reconsideration and you said that "the

10  request is granted for an evidentiary hearing," and I'm reading

11  at page 7 of your opinion, "on the factual issue of whether

12  Aliev has access to the requested documents."  So I think it's

13  clear the burden of proof is on the petitioner to demonstrate

14  that in fact Mr. Aliev had possession, custody, or control of

15  the documents.  And we believe that it is clear he does not.

16          Now, Mr. Geercken has said and the petitioners have

17  said that they satisfy their case because Mr. Aliev is a party

18  to an employment agreement that says he's a vice president of

19  Interros -- that's correct, that he is, and that he's on the

20  Interros website as a vice president -- and therefore, because

21  the contract incorporates the regulations that we just heard

22  about, he has the ability to get the documents in question.

23          But that is not enough.  You will hear Mr. Aliev

24  explain to you that, with the exception of the one transaction

25  that he had responsibility for because of his past dealings at

1    Interros and his past dealings with the company in question,

2    since 2010, Mr. Aliev has done nothing for Interros and has not

3    been asked to do anything for Interros.

4          Significantly, not only has his salary declined to

5    about, under his documents, to about $700, U.S. dollars, a

6    month; he has not collected that salary for over three years,

7    before, long before the subpoenas were served.

8          He has no assistants.  He has nobody who reports to

9    him.  He has no task that he's been asked to perform.  He

10   doesn't have an e-mail account, hasn't had one for years.  He

11   hardly knows anybody at Interros.  There's no one who reports

12   to him.  He doesn't have bank-signing authority, check-signing

13   authority, doesn't get board minutes.  And those are the facts

14   that you have to look at.  It's not just a label, the cases

15   say.

16         Now, under the law, these cases say, you have to

17   demonstrate factually, whether you have a title or a non-title,

18   that that title gives you control.  Yes, the regulations say

19   that the vice president has the kind of potential power that

20   Mr. Geercken alluded to.  But, and this goes to the difference

21   between the two experts, our expert says, that's what the

22   regulations say, but that doesn't mean you have the power to

23   demand the documents if you haven't been asked to exercise the

24   power.  He has not been asked to represent foreign investors.

25   He has not been asked to represent Interros before public

1    authorities, and all the other provisions in the regulations.

2    And our expert says, under those circumstances, the theoretical

3    ability that you get documents if you're asked to perform a

4    duty, that's not for your Honor to say, even though I haven't

5    been asked in five years to do anything, to demand that they

6    give you the documents.  That's not what Russian law is.

7         And going back to U.S. law, factually, the question

8    you have to ask, that should be asked: Does he as a practical

9    matter have control?

10        Now, as to that matter, there can't be any question,

11   and Mr. Aliev will testify to this, not only didn't he have

12   anybody who reports to him, he didn't know who to call other

13   than the top people at the company.  That's not who -- he

14   doesn't deal with, he hasn't dealt with anyone else.  Their

15   expert said he should have called someone in the IT department.

16   He doesn't know anyone in the IT department.

17        So who did he call, what did he do after he

18   understood, under your order, that he had to get the documents

19   from Russia?  He called the general counsel of the company,

20   whom he's known probably as long as Mr. Potanin.  And he said,

21   Marianna, first name, I need the documents, Judge Preska has

22   ordered me to get the documents, and if I don't get the

23   documents I may be going to jail, I may be fined significantly.

24   And what did she say?  I'm sorry, you are not going to get the

25   documents, you are not entitled to the documents because you

haven't done anything as a vice president for all this time, I

sympathize with you and I hope the Court understands.

         And so then he sent an e-mail to her reiterating his

request.  And then I personally called her, and I said the same

thing.  And I got the same response.

         So then what did he do?  He called the president and

principal investor of the company, Mr. Potanin, and he made the

same request.

         THE COURT:  Your client's opponent.

         MR. CARDOZO:  Yes.

         And the response was no.  And then he got a letter

from the CEO of the company saying no.

         Your Honor, there is nothing more he could do -- with

one exception.  According to their expert, he could have

brought suit in Russia.

         Number one, our expert, unlike their expert, says, you

would have lost, for exactly the same reasons, because our

expert says you're not entitled to them.  And number two, your

Honor, and I'm not trying to reargue the scope of 1782 with

you, but it's one thing to say that someone sitting in the

United States should push a button on a computer and get the

documents wherever they may be, analogous perhaps to your

*Microsoft* ruling; it's another thing to say that a third party

in a 1782 proceeding not only has to try to get the documents,

but has to hire a Russian lawyer and sue.

1          And Judge Chin when he was on the district court in

2     the case involving --

3          THE COURT:  The Judge Chin case.

4          MR. CARDOZO:  Yes.

5          -- said, in a much easier case, it would seem to me --

6     somebody's manager, accountant had refused to give the

7     respondent his requested documents.  And the respondent kept

8     saying, give me, give me, give me.  And the manager said, no,

9     no, no.  And Judge Chin said, sorry, you can't expect him to do

10    any more.  He didn't say, go sue him.

11         THE COURT:  The major difference here is that

12    Mr. Potanin, petitioner's opponent in the underlying action,

13    seems to be controlling everything.  He's certainly the head of

14    the company.  The general counsel reports to him, obviously.

15    And asking him for these documents is probably not a useful

16    exercise.

17         MR. CARDOZO:  Your Honor, yes.  But first of all, the

18    rejection letter came from the CEO, not Mr. Potanin.  But one

19    is president, one is CEO.  But Mr. Potanin is certainly the

20    principal investor.

21         But there is nobody else he could have asked.  He

22    doesn't know the IT people.  He doesn't know the lower-level

23    people because he hasn't dealt with them for years.  He called

24    the general counsel, whom he dealt with for years, and asked

25    for that.  To force him under those circumstances to go to the

F6HAPOTHps                    Opening - Mr. Cardozo

1    expense of going to Russia, hire a lawyer, when his lawyer has

2    said, you don't have a case in Russia, that's not what the law

3    is, your Honor.  You have to look at the facts.  And when you

4    add the facts I've just alluded to, to the fact that he has not

5    done anything for five years for this company -- yes, he has a

6    document that says he's the vice president, yes, the regulation

7    lists theoretical powers of a vice president, but he hasn't

8    exercised those powers, and according to our expert, if you

9    haven't exercised them, then the Article 22 that Mr. Geercken

10   referred to under Russian law, where you have to be given the

11   tools to carry out your functions, doesn't apply because he

12   hasn't been asked to carry out those functions.

13          And so therefore, your Honor, as I think you will hear

14   from Mr. Aliev and you'll see from our expert's report, he

15   lacks the legal control and he lacks the practical ability to

16   get the documents, and therefore the motion to compel should be

17   denied.

18          THE COURT:  All right.  Thank you.

19          Mr. Geercken, did you want to add anything at this

20   point?

21          MR. GEERCKEN:  Your Honor, I'll just make a couple of

22   quick points.  We have done a little bit of looking to see if

23   there's anything further on the *IBM* case, and we have not been

24   able to find -- it's a 1979 case and there's no subsequent

25   history noted.  But we'll double-check and see if we can get

F6HAPOTHps                          Opening - Mr. Cardozo

1    it.

2            THE COURT:  Eventually they settled that case after,

3    what, ten years of litigation or something?

4            MR. GEERCKEN:  I believe that's right, your Honor.

5            I think one case has been noted, the *Shcerbakovskiy*

6    case, that has been cited by Mr. Aliev's counsel, and in that

7    case the court determined that a persistent failure and refusal

8    to produce documents should be met with the strongest sanction

9    available.  And in that case, there was a determination that

10   Russian law did not preclude or prevent a party from being

11   compelled to produce information.

12           So I think the case law is quite clear that companies

13   cannot just circumvent the law by saying it's just not possible

14   for you to get the information.

15           THE COURT:  All right.  Shall we begin.

16           MR. GEERCKEN:  That would be good.  Thank you, your

17   Honor.  If it would please your Honor, we would like to call

18   Mr. Aliev to the stand.

19           THE COURT:  Yes, sir.

20    GUERMAN ALIEV,

21       called as a witness by the plaintiff,

22       having been duly sworn, testified as follows:

23           THE COURT:  Counsel.

24           MR. GEERCKEN:  Thank you, your Honor.  If it would

25   please the Court, we would like to provide Mr. Aliev with a

F6HAPOTHps                    Aliev – direct

1    couple of binders that we might ask him to look through as he

2    is testifying.  So if we could approach, we would like to do

3    that.

4              THE COURT:  Yes.

5              MR. CARDOZO:  Those are the three binders?

6              MR. GEERCKEN:  Yes, that is correct.

7    DIRECT EXAMINATION

8    BY MR. GEERCKEN:

9    Q.  OK.  Good morning, Mr. Aliev.

10   A.  Good morning.

11   Q.  You are a current resident of the United States; is that

12   correct?

13   A.  That is correct.

14   Q.  And you presently maintain a title at Interros; is that

15   correct?

16   A.  That is correct.

17   Q.  And you are in fact a vice president of Interros, correct?

18   A.  You're talking about right now.  Yes.

19   Q.  Yes.  And you are the sole vice president of Interros,

20   correct?

21   A.  It appears to be, as I reviewed the materials as part of

22   this motion.

23   Q.  Right.  And you've held that position since August of 2010;

24   is that correct?

25   A.  That appears to be what the documents say.

F6HAPOTHps                    Aliev - direct

1    Q.  And the president of Interros is Vladimir Potanin?

2    A.  I believe so.

3    Q.  And you understand that Vladimir Potanin is the husband, or

4    the former husband, of the petitioner, Natalia Potanina,

5    correct?

6    A.  I understand that.

7    Q.  And you understand that Mr. Potanin is the principal

8    investor in Interros, correct?

9    A.  That's my understanding.

10   Q.  Right.  And you understand that -- you also hold a role

11   with Altpoint; is that correct?

12   A.  That is my main role.

13   Q.  Yes.  And Interros is a major investor in Altpoint

14   Holdings; is that correct?

15   A.  Interros is an investor in Altpoint's funds.

16   Q.  And it is the major significant investor in those funds,

17   correct?

18   A.  That is correct.

19   Q.  And is it correct that employees of Altpoint from time to

20   time have to coordinate and communicate with employees of

21   Interros?

22   A.  As any investment manager communicates on a regular basis

23   with investors, Altpoint employees do the same.

24   Q.  Correct.  And from time to time in your capacity as --

25   president of Altpoint?

1    A.  I am the CEO and partner.

2    Q.  CEO and a partner.  And from time to time you have to

3    communicate with representatives of Interros, correct?

4    A.  From time to time I communicate, as my counsel stated, with

5    Mr. Potanin and the GC.

6    Q.  Very good.  Now, am I correct that as early as 2003, you

7    began to work at entities that were owned, directly or

8    indirectly, by Mr. Potanin?

9    A.  I worked in a senior capacity at Rosbank that was, at the

10   time when I joined the bank in 2003, majority owned by

11   Interros.

12   Q.  And you were the head of all investment banking at Rosbank,

13   correct?

14   A.  I was the head of investment banking at Rosbank, that is

15   correct.

16   Q.  And you stayed at Rosbank until 2008; am I correct?

17   A.  Approximately that year, I believe so.

18   Q.  And from there you went to Norilsk Nichols for a short

19   time, correct?

20   A.  For a very short time, a couple of months, correct.

21   Q.  And is it your understanding that Norilsk Nickel is owned,

22   directly or indirectly, by Interros?

23   A.  That is incorrect.  Interros is a significant shareholder

24   in Norilsk Nickel, but it is not owned by Interros.

25   Q.  But it is a significant shareholder in Norilsk.

F6HAPOTHps                    Aliev - direct

```
1    A.  Correct.

2    Q.  And was at the time, correct?

3    A.  Correct.

4    Q.  And you were tasked with handling international mergers and

5    acquisition work for Norilsk, correct?

6    A.  I never settled into the role.  It was two months.  I came

7    on board because the then CEO of Rosbank transitioned to a role

8    in Norilsk, and then he abruptly left and I abruptly left.  So

9    there was -- I didn't set up an office.

10   Q.  So the idea was, as you testified earlier, that you would

11   handle the M&A activity.

12   A.  The idea was that I would handle Norilsk's international

13   M&A.

14   Q.  And then after the brief stay at Norilsk, you went to

15   Interros; is that right?

16   A.  Correct.

17   Q.  And your initial title at Interros was deputy CEO; is that

18   correct?

19   A.  That is correct.

20   Q.  And that was in 2008; is that correct?

21   A.  Yes.

22   Q.  All right.  And your functional role at that time was

23   overseeing Interros's foreign investments; is that correct?

24   A.  The functional role was to oversee investments, and I

25   focused on the international investment, to be more precise.
```

1   Q.   So is it fair to say that one of your roles as deputy CEO

2   was to oversee Interros's foreign investments?

3   A.   There is a big distinction between overseeing investments

4   as a deputy CEO of Interros and being a fund manager at a third

5   party, huge distinction.  But my role at Interros was to

6   evaluate the performance of other fund managers that Interros

7   invested with.

8   Q.   OK.  When you testified at deposition earlier, I asked

9   you --

10  A.   I'll explain.

11  Q.   -- what your position was at Interros, and at that time you

12  said your functional role was overseeing Interros's foreign

13  investments.  Is that accurate?

14  A.   Let me be more precise and more manifest.  The role was to

15  evaluate the performance of funds that Interros invested with

16  other fund managers.

17  Q.   And that included --

18          THE COURT:  What was the foreign part of it?  Foreign

19  funds?

20          THE WITNESS:  Foreign funds.  I can't give you the

21  name of the funds, but they would be major funds in the United

22  States and in Europe.

23  Q.   And when you applied for a job at Interros, you didn't have

24  to submit a formal application; is that correct?

25  A.   I don't remember exactly how the process worked out.  I

F6HAPOTHps                    Aliev - direct

 1   could have filled out a form.  I don't remember.  It's not

 2   inconceivable.

 3   Q.  We discussed this at your deposition, and maybe, Alex, you

 4   have a copy of the deposition.

 5          MR. GEERCKEN:  May we approach with a copy of the

 6   deposition, your Honor?

 7          THE COURT:  Yes.

 8   A.  Thank you.

 9   Q.  At page 24, line 16, I believe I asked you -- I'll let you

10   get there.

11   A.  Yes.

12   Q.  "Q.  Did you apply for the job or did they offer you the

13   job?"

14          And you said, "I don't remember the sequencing.  I

15   don't think there was a formal application per se."

16          Correct?

17   A.  That is exactly what I said at the deposition.  And I am

18   telling you, as this was seven years ago, I don't remember

19   exactly what the process was.

20   Q.  But you knew people at Interros from your time working at

21   Rosbank, correct?

22   A.  Most certainly.

23   Q.  There were Interros representatives on the Rosbank board

24   who you reported to when you worked at Rosbank, correct?

25   A.  The managers report to the board as an entity, not to

F6HAPOTHps                    Aliev - direct

1   specific board members.  As Rosbank at the time was majority

2   owned by Interros and as a member of the management board of

3   Rosbank, we reported to the board.

4   Q.  Right.  And there were Interros representatives on the

5   board of Rosbank at that time.

6   A.  Correct.

7   Q.  And one of those board members was Marianna Zakharova,

8   correct?

9   A.  Yes.  At some point she joined, I believe not from the very

10  beginning but later on.

11  Q.  And Ms. Zakharova later became Interros's general counsel,

12  correct?

13  A.  She was an internal -- an attorney, an internal lawyer at

14  Interros at the time.  I'm not sure exactly what her Interros

15  title was.

16  Q.  And Interros, how would you describe the business of

17  Interros?

18  A.  Interros is a holding company that makes investments

19  directly in other companies and investments in other funds,

20  managed by fund managers.  So it acts as a direct investor and

21  it acts as a sort of fund of funds, to be technical about the

22  investment process.

23  Q.  And you understand that it is a very large holding company,

24  correct?

25  A.  It is a large company.

F6HAPOTHps                    Aliev - direct

1   Q.  And what is the extent, in terms of dollars, to the best of

2   your knowledge, of its investments?

3   A.  Would you like for me to say what I thought it was at the

4   time or what it is now?  Because I don't know what it is now,

5   as I managed some of Interros's funds as a fund manager.  What

6   it was at the time I can't really attest to exactly, and I can

7   speak about what I was doing.

8   Q.  OK.  Can you tell us at the time that you were active at

9   Interros as the deputy CEO, that period of time, what was the

10  amount?

11  A.  Interros was as a -- I don't know the amount, but Interros

12  was a substantial investor in Norilsk Nickel.  It had media

13  assets, it had banking assets where I was an executive, and

14  other smaller investments.

15  Q.  OK.  And is it fair to say that its investments were in the

16  billions of dollars?

17  A.  Fair to say.

18  Q.  And you said you were not familiar with the structure of

19  Interros.

20  A.  I never had to get to the legal structure of the entity.  I

21  concerned myself with evaluating performance, like I said, of

22  Interros's foreign investments.  I knew who my seniors were and

23  I knew what I needed to do for my job.

24  Q.  And in fact your testimony, when we talked earlier, was

25  that you didn't care about the legal structure of Interros.

1    A.  It was for the most part irrelevant to me.

2    Q.  And as the deputy CEO, you reported to the CEO at that

3    time, correct?

4    A.  That is correct.

5    Q.  And who was the CEO at that time?

6    A.  When I joined Interros in 2008, the CEO of Interros was

7    Mr. Klishas, K-l-i-s-h-a-s.

8    Q.  And the CEO, he reported to the principal shareholder,

9    correct?

10   A.  I really don't want to infer what their relationship was.

11   I reported to Mr. Klishas, and I had interactions with

12   Mr. Potanin.

13   Q.  I would like to draw your attention back to your deposition

14   transcript at page 33, line 24.

15   A.  Looking at it.

16   Q.  Can you read --

17   A.  "He was answering to the principal shareholder, I would

18   imagine."

19   Q.  So you understood, you believed that the CEO reported to

20   the principal shareholder.

21   A.  The reason I put the qualifier in there is that I cannot

22   speak for him.  It would be accordant with what I observed.

23   But I can't speak as to his formal report.  I'm sorry.

24   Q.  But it was consistent with what you observed.

25   A.  It is consistent with what I've observed, correct.

F6HAPOTHps                    Aliev - direct

1    Q.  And the principal shareholder, you understood, was

2    Mr. Potanin.

3    A.  Correct.

4    Q.  And one of your primary responsibilities at the time was

5    evaluating Interros's largest out-of-Russia investment,

6    correct?

7    A.  Correct.

8    Q.  That was the Stone Tower investment?

9    A.  Again, for clarity, Stone Tower is a U.S. fund manager,

10   with whom Interros invested.  And Stone Tower made decisions to

11   invest independent of Interros's opinion, just like, counselor,

12   you would give your funds to Prudential and they would act --

13   and they would do what they want to do, and then you would

14   evaluate the returns.

15   Q.  And you were evaluating the investments of Stone Tower; is

16   that correct?

17   A.  Correct.

18   Q.  And from time to time in your role as deputy CEO you would

19   meet with Mr. Potanin, correct?

20   A.  Absolutely.

21   Q.  And those meetings occurred approximately once a month,

22   right?

23   A.  Something like that.

24   Q.  And most of the time that was just the two of you, correct?

25   A.  That I cannot attest to.  There could be other people in

1    the meeting.  It could be a group meeting, or it could be a

2    one-on-one.

3    Q.  So there was a variety of meetings.  Sometimes you were

4    alone with him and sometimes other colleagues would join you.

5    A.  True.

6    Q.  And your relationship with Mr. Potanin sometimes included

7    social functions, correct?

8    A.  Invitation only.

9    Q.  And in fact you attended a birthday party for Mr. Potanin,

10   correct?

11   A.  As did hundreds of other people.

12   Q.  But you were invited to attend that by Mr. Potanin.

13   A.  Correct -- no, by his office.

14   Q.  Now, in 2009 you moved to the United States.  Is that

15   correct?

16   A.  Correct.

17   Q.  And you moved to the United States to start Altpoint; is

18   that correct?

19   A.  That is correct.

20   Q.  And Altpoint is really the new name for Stone Tower; is

21   that right?

22   A.  It's a new team of fund managers.  I brought on board my

23   own team that I hired in the United States, and it became a new

24   fund manager.  But it did take some of Stone Tower investments

25   to perform functions on them, as fund managers do.

F6HAPOTHps                        Aliev - direct

 1                THE COURT:  What do you mean by "took"?

 2                THE WITNESS:  Transferred.  They were transferred

 3       into -- the Stone Tower funds were transferred into Altpoint

 4       funds.

 5                THE COURT:  For payment or just transferred?

 6                THE WITNESS:  No, the actual assets, the actual

 7       corporate entities.  So, for example, if Stone Tower had an

 8       investment into a crane company out of Pennsylvania, that we

 9       managed that investment now to make HR decisions, spinoffs,

10       acquisitions into that investment became my responsibility, as

11       a third-party manager of Interros's investments.

12                THE COURT:  Essentially you were taking over -- you

13       were stepping into the shoes of Stone Tower with respect to

14       that investment.

15                THE WITNESS:  Correct.

16       A.  And then I renamed it, because, as fund managers, we're

17       working for our brand and recognition, so I renamed it to be

18       called Altpoint.

19       Q.  That was a seeding of a private equity venture, correct?

20       A.  Altpoint is a private equity fund, SEC-registered private

21       equity fund.

22                THE COURT:  What was the verb you used, s-e-e-d-i-n-g

23       or C-e-d-i-n-g.

24                THE WITNESS:  Seeded, s-e-e-d.

25                THE COURT:  Thank you.

F6HAPOTHps                    Aliev - direct

1    Q.  And this was Interros's largest out-of-Russia investment,

2    correct?  Investment through Altpoint?

3    A.  It is certainly a large investment.  Whether it's

4    Interros's largest investment now I don't know.  But it was a

5    large, Interros's large investment.

6    Q.  But when you became the CEO of Altpoint, you retained the

7    position, you retained a position at Interros, correct?

8    A.  I retained a title of Interros.

9    Q.  And you retained that at your request, right?

10   A.  I retained that as my request, correct.

11   Q.  And in fact you wanted it as a credential, correct?

12   A.  I asked Interros to -- for me to be able to retain a title

13   as Altpoint was not a recognizable name in the United States,

14   and I thought it would serve me well to present that credential

15   and present that connection, when I went about the business of

16   sourcing investments.

17   Q.  And that was because Interros was a large internationally

18   recognized entity, correct?

19   A.  That was my belief.

20   Q.  So that was a benefit to you, you believed, in having that

21   credential.

22   A.  Correct.

23   Q.  Now, let's talk a little bit about Altpoint.  You became

24   the majority owner of the management company, correct?

25   A.  I am a majority owner, I became the majority owner of the

F6HAPOTHps                     Aliev - direct

1   management company, correct.

2   Q.  In fact you own 99 percent of the management company,

3   correct?

4   A.  Something like 90 percent.

5   Q.  90 percent, OK.  And your compensation is based on -- is it

6   based on your ownership of the management company?

7   A.  It doesn't quite work that way.  With all fund managers in

8   the United States, SEC-registered fund managers in particular,

9   investors that entrust us with funds that we manage pay a fee

10  to the management company, and that fee is expensed to pay for

11  the way we go about our business -- office leases,

12  transportation, and compensation.

13  Q.  And the fee is based on a percentage of the assets under

14  management; is that correct?

15  A.  As a rough guideline, yes.  But there are arguments about

16  what the fee should be between the fund managers and investors

17  that invest in funds.

18  Q.  And what is that percentage that you're entitled to?

19  A.  That percentage typically and at Altpoint could be anywhere

20  between 1 1/2 percent to 2 1/2 percent of either committed

21  funds or investments or invested funds based on the life of the

22  fund.

23  Q.  And the funds, the Interros funds under management at

24  Altpoint, as the CEO of the management company, what is the

25  extent of these funds?

1   A.  This would be, I guess -- so we have an SEC filing every

2   year that we update.  I'm not sure exactly what the last one

3   was, but in the beginning when I took over the portfolio it was

4   somewhere in between 2 to 3 hundred million dollars of overall

5   funds that Altpoint managed.

6   Q.  And what time period was that?

7   A.  That's when I transitioned to become the founder of

8   Altpoint, in 2009.

9   Q.  And what is the amount of assets under management, of

10  Interros assets under management now, at Altpoint?

11  A.  I am trying to figure out what part of that would be

12  confidential.  Usually funds don't disclose that.

13          MR. GEERCKEN:  We have a protective order in this case

14  and we can -- I designate this portion of the transcript as a

15  confidential document.

16          THE WITNESS:  Can I seek the advice of my counsel?

17          MR. CARDOZO:  I think, Mr. Aliev, that we both deem it

18  confidential, and I think if you know the answer you can

19  answer.

20          THE COURT:  If what?

21          MR. CARDOZO:  If he knows the answer he should answer

22  it.

23          (Page 32 sealed by order of the court)

24

25

1          THE COURT:  Total.

2          THE WITNESS:  Total.

3          THE COURT:  OK.

4          All right.  Go ahead, counsel.  Did you want to follow

5     up on that?

6     Q.  And you are also an investor at Altpoint, correct?

7     A.  In any fund management company, senior employees become

8     investors in the same transaction but in the same fund as the

9     third-party investors whose funds we manage.  That would be

10    typical of any fund manager -- Blackstone, Carlyle, and

11    Altpoint.

12         THE COURT:  Let me just be sure I understand the

13    Interros portion.  Interros is, at the least, a substantial

14    investor in --

15         THE WITNESS:  The funds.

16         THE COURT:  -- Altpoint's funds.

17         THE WITNESS:  Correct.  Not in the management -- well,

18    in the management company for a tiny bit because I own 90

19    percent of it, but they are a substantial investor in Altpoint

20    as well, correct.

21    Q.  And I think you said that -- at your earlier deposition --

22    we'll look for the cite -- that you believed that Altpoint,

23    that the Interros investments in Altpoint funds constituted

24    roughly 90 percent of those investments?

25    A.  Something like that number.  In that order of magnitude.

F6HAPOTHps                    Aliev - direct

1    Q.   So it's fair to say that Interros is the dominant investor

2    in Altpoint funds, correct?

3    A.   That is a fair statement.

4    Q.   And your performance at Altpoint is evaluated by

5    Mr. Potanin and Interros's controller, Mrs. Zinovieva --

6              MR. GEERCKEN:   And I'll help with you that, madam

7    court reporter.   I think it's Z-i-n-o-v-i-e-v-a.

8    A.   Interros has a formal controlling function.   And Altpoint

9    as a fund manager has formal reporting requirements to the

10   investors.   We produce audited financials for the funds

11   annually, very typical of any other fund manager.   And once

12   every so often we need to explain the financials and, by virtue

13   of that, we are interacting with a very formal Interros

14   controlling function.   And separately from that, like you

15   alluded to, I do talk to Mr. Potanin from time to time to

16   present the performance, by Altpoint.

17   Q.   And -- forgive me.   I didn't mean to interrupt you, sir.

18   If I turn to page 45 of your transcript, we talked about

19   this --

20   A.   Depo transcript, right?

21   Q.   Yes.   At line 2, I asked you about the nature of your

22   interaction with Mr. Potanin about the Altpoint business

23   matters.

24   A.   Right.

25   Q.   And you said you report to him and other people that he

F6HAPOTHps                      Aliev - direct

```
 1   appointed to evaluate your performance.  Right?
 2   A.  Correct.
 3   Q.  And I asked who the other folks are that evaluate your
 4   personal performance.  And you identified Ms. Zinovieva,
 5   correct?
 6   A.  Correct, who is the CFO and controller of Interros.
 7   Q.  Very good.  And your responsibility at Altpoint is to
 8   manage, as a fiduciary investment owner, investments of
 9   Interros, correct?
10   A.  Fiduciary to all of the investors who invest with Altpoint.
11   Q.  And certainly Interros is the large investor.
12   A.  Correct.  But also some -- complete independence, and they
13   would have the same treatment.
14   Q.  Now, there came a time when Altpoint hired a relative of
15   Mr. Potanin, correct?
16   A.  Correct.
17   Q.  And in fact it was his son, right?
18   A.  You know better than me.
19   Q.  Well, sir, I didn't --
20   A.  That is correct.
21   Q.  -- run Altpoint.  And the son is Ivan Potanin, right?
22   A.  Correct.
23   Q.  How long did Mr. Ivan Potanin stay with Altpoint?
24   A.  He was a low-ranking analyst.  His tenure probably was
25   approximately about a year.
```

F6HAPOTHps                    Aliev - direct

```
1    Q.  Right.  And do you recall that timing, when that year was?

2    A.  Doesn't fall off the tongue.  About a year and a bit ago.

3    Q.  A year and a bit ago.  Isn't it correct that, just shortly

4    after Mrs. Potanin commenced legal proceedings against

5    Mr. Potanin, that Ivan Potanin was terminated at Altpoint?

6    A.  The fact that it did or not dovetail in time has nothing do

7    with his performance, I guess, or his employment at Altpoint.

8    Q.  But he was terminated.

9              THE COURT:  Ms. reporter, would you read the question

10   back to the witness, please.

11             (Record read)

12   A.  It appears now that that was the case.  I didn't even know

13   that there was a case against Potanin at the time.

14             THE COURT:  It was only --

15             THE WITNESS:  I don't remember the exact timing.  It

16   was about -- in the same year.

17   Q.  Thank you, Mr. Aliev.

18   A.  You're welcome.

19   Q.  Now, you received a subpoena in connection with this matter

20   roughly in February of last year; is that correct?

21   A.  That is -- Altpoint and me personally received the original

22   subpoena in February of last year, correct.

23   Q.  Right.  And you got that subpoena directly from a law firm;

24   is that correct?

25   A.  I got that from the receptionist, who signed for it.
```

1   Q.  And then a law firm contacted Altpoint in connection with

2   that subpoena, correct?

3   A.  I'm not sure exactly what happened.  We hired counsel when

4   the subpoena ended up on my desk.

5   Q.  And the counsel that was hired was the Debevoise firm,

6   correct?

7   A.  The same counsel that, that put together four of the

8   different foundation documents for the company.

9   Q.  And when we talked at your deposition about who paid the

10  counsel fees for Debevoise, you said you didn't know who paid

11  those fees.

12  A.  Well, I did refresh my memory.  Altpoint pace those fees.

13  Q.  Altpoint pays those fees, correct?

14  A.  Correct.

15  Q.  That what your testimony is now?

16  A.  Correct.

17  Q.  And when did they start paying those fees?

18  A.  I don't know.  But my counsel is telling me that we're

19  paying Debevoise' fees.

20  Q.  And who did you check that with?

21  A.  Altpoint's GC.

22  Q.  And you don't know when Altpoint began paying those fees;

23  is that correct?

24  A.  Don't know.

25  Q.  Is Altpoint paying Debevoise, did Altpoint pay Debevoise's

F6HAPOTHps                    Aliev - direct

1   fees with respect to your personal subpoena?  Did you check on

2   that?

3   A.  So, counsel, to be clear, the original representation for

4   Altpoint and me was through Debevoise.  When it became clear --

5   and it wasn't clear at the time -- that I was subpoenaed and

6   ordered to do something that may conflict with Altpoint as a

7   corporate entity, I hired additional counsel to represent me,

8   Proskauer, Mr. Michael Cardozo, and Altpoint is paying for

9   those pieces too.

10  Q.  OK.  I guess my question to you is, my question was, do you

11  personally pay for the fees associated for the work that,

12  first, Debevoise performed for you, or to some other entity?

13  A.  I was subpoenaed in connection with my work.  I owned a

14  company.  It was a tax efficient way of paying it, to pay it

15  from Altpoint.

16  Q.  With respect to the fees that you incurred, do you know

17  when Altpoint began paying those fees?

18  A.  I don't.

19  Q.  Did you take any steps other than retaining counsel to try

20  and obtain information that was subject to the subpoena?

21          MR. CARDOZO:  Object to the form.  Let me ask what

22  time period.

23          MR. GEERCKEN:  Thank you, Michael.  That's a good

24  objection.  Let me rephrase that.

25  Q.  If February of last year when you received the subpoena,

1   did you take any steps to locate documents or information that

2   were responsive to the subpoena?

3   A.  Counselor, I sought advice of my counsel, who requested

4   that I produce -- that I submit to the information discovery.

5   Debevoise at the time took an extensive search of responsive

6   documents on Altpoint servers.  And in addition to that, I took

7   a search on my personal e-mail accounts that were -- now they

8   are in the cloud, they don't reside on anyone's drive -- and

9   produced the responsive documents over to the petitioner, to

10  yourself, at the time.

11  Q.  And that was in February of last year that you undertook

12  that, sir?

13  A.  I don't remember the exact month.  It was in response to

14  the subpoena that was -- that I received in February.

15  Q.  Well, if you would take a look at your transcript, at page

16  59, line 12, I asked you, "When did you first undertake a

17  search for responsive information?"  Right?  And you said, you

18  personally, in September of last year, when an order came out.

19  Is that correct?

20  A.  Counselor, this is --

21          MR. CARDOZO:  I object.

22  A.  This is how it happened.

23          MR. CARDOZO:  Objection.

24  A.  Let me --

25          THE WITNESS:  Michael --

1          MR. CARDOZO:  Objection.

2          THE COURT:  Counsel.

3          MR. CARDOZO:  Your Honor, in a deposition he said that

4     Debevoise was able to search his documents, which he just

5     referred to.  There is a declaration to that effect.  So I

6     think it is misleading to suggest that he personally was doing

7     anything other than asking counsel for the documents.

8     Q.  If I could ask, Mr. Aliev, could you read lines 12 through

9     21 of page 59?

10    A.  "Q. When did you first undertake a search for responsive

11    information?

12    "A. Me personally?

13    "Q. Yes."

14         THE COURT:  I'm sorry, sir.  It's easier for the

15    reporter if you do Q and then "A:  Me personally," "Question:

16    Yes."  Go ahead.

17    A.  Got it.

18    "Q. When did you first undertake a search for responsive

19    information?

20    "A. Me personally?

21    "Q. Yes.

22    "A. I believe when the ruling that I should produce some

23    documents personally in September of last year came about,

24    that's when I searched my personal information outside of what

25    counsel did with the company servers."

F6HAPOTHps                    Aliev - direct

                    So I did look into this.  And, counsel, with all due

respect, please understand that this subpoena is, however

topical, is an enormous expense and a nuisance to my business.

I conducted a search, on advice of Debevoise at the time,

through my personal servers.  I can't pinpoint the month.  When

the new court order came that that information was

insufficient, I hired Proskauer and sought advice from them.

That's what I have done.

Q.  My question to you is, when did you first undertake a

search, and your deposition testimony suggested that it was

roughly around September of last year.

A.  I can't pinpoint a month.  It was before the additional

court order was issued to me.

Q.  And is there any reason that you think your testimony at

your deposition was inaccurate?

            MR. CARDOZO:  Objection.

A.  Let's not allude to --

            MR. CARDOZO:  Objection.

            THE COURT:  If there's an objection won't you hold

your answer so that we can work it out.

            MR. CARDOZO:  Your Honor, I think --

            THE COURT:  Is there any reason he can't answer the

question?

            MR. CARDOZO:  I think we've gone over this.  I think

he was mischaracterizing both the deposition and Mr. Aliev's

F6HAPOTHps                    Aliev - direct

1    testimony.

2              THE COURT:  Sustained -- I'm sorry.  Overruled.

3              Do you have in mind the question, sir, or would you

4    like it put to you again?

5              THE WITNESS:  It can be put to me again.

6              MR. GEERCKEN:  Certainly.

7    Q.  As you sit here today, is there any reason that you believe

8    that your testimony that you just read into the record is now

9    inaccurate?

10   A.  There is a reason to believe that, as months go by and I

11   refresh the memory on thousands of documents, thousands of line

12   of text that were presented to me, that I could be off on a

13   month.  However, I do have, or at least I try to have a fairly

14   good memory of milestones, and what I would like to tell you is

15   that I did conduct a search of personal records prior to the

16   additional court order that mandated me to do something outside

17   of what I have done as part of the original subpoena.

18   Q.  My question is simply, do you believe that that testimony

19   that you read into the record is inaccurate?

20   A.  I have answered it as best I could.

21   Q.  You just don't know.  Is that your testimony?

22   A.  I don't know the exact month when I first conducted a

23   personal search, and I don't want for this to come off

24   uncooperative, but I don't know.

25   Q.  When did you contact Mr. Potanin for the first time about

F6HAPOTHps                    Aliev - direct

1    the subpoena?

2    A.   When the motion for Interros Russian domestic records was

3    presented to me, when the court order was presented to me, I

4    sought advice of different counsel, Proskauer, and I have done

5    what Mr. Cardozo explained and elucidated in the opening

6    remarks; I contacted pretty much the only people I ever talked

7    to, the GC at Interros and Mr. Potanin, and asked them for his

8    documents.  It is quite inconceivable that I would go to anyone

9    else.  I hardly know anyone else.

10   Q.   Mr. Aliev, my question was simply when you started, when

11   you did that.

12   A.   October.

13   Q.   October of last year --

14   A.   Of last year.

15   Q.   -- is the first time that you contacted Mr. Potanin and the

16   others you've mentioned; is that correct?

17   A.   Correct.

18   Q.   OK.  Mr. Aliev, I'd like you to take a look at the exhibit

19   binder.  It's the joint exhibit binder, the big one.  Does that

20   help?  And I'd like you to like a look at Exhibit 4.

21   A.   Looking at it.

22   Q.   And that is your employment contract.  Correct?

23   A.   Technically a labor contract.  But substantially similar to

24   what is meant in the United States by the employment contract.

25   Q.   Right.  And that was your employment contract, your labor

1    contract, with Interros, correct?

2    A.  That appears to be so.

3    Q.  And it's dated October 1st, 2008, correct?

4    A.  That is right.

5    Q.  And you signed that labor agreement, correct?

6    A.  I have.

7    Q.  And you were hired for the position of deputy chief

8    executive officer, correct?

9    A.  Correct.

10   Q.  And you've already testified about the services that you

11   were to perform as deputy chief executive officer, correct?

12   A.  Correct.

13   Q.  And in paragraph, or article 5, additional terms, 5.2 talks

14   about confidential information, correct?

15   A.  It does talk about that.

16   Q.  And that contemplates that you might get access to

17   confidential information, correct?

18   A.  I would not want to infer from the document.  The document

19   says what it says.

20   Q.  And is it your position that you never received access to

21   confidential information at Interros?

22   A.  It is my position that I could have been privy to

23   confidential information at Interros as I was a senior exec at

24   Interros at the time.  As to the nature of that information,

25   seven years ago, I don't remember.

F6HAPOTHps                    Aliev - direct

```
1    Q.  And then I'd like to turn your attention to, I think we

2    have a 4-G.  Do you see that?

3    A.  Tab G in Exhibit 4?

4    Q.  Correct.

5    A.  Looking at it.

6    Q.  OK.  And Mr. Aliev, this is an agreement that you entered

7    into August 2nd, 2010; is that correct?

8              THE COURT:  Counsel, may I just ask you where you are.

9              MR. GEERCKEN:  Yes, your Honor.

10             THE COURT:  4G, in the index to the Joint Exhibits, is

11   in Russian.

12             MR. GEERCKEN:  Yes, your Honor.  Forgive me.  I think

13   we probably should have started with the translations.  If you

14   turn a few pages in you'll get to the English translation.  Two

15   pages in.

16             THE COURT:  Alrighty, then.  Thank you.

17             MR. GEERCKEN:  Sorry about that.

18   Q.  OK.  And this is an agreement that you've signed, correct?

19   A.  Correct.

20   Q.  And this was a supplement to the agreement that we've

21   talked about, correct?

22   A.  That's what it says.  Supplemental agreement.

23   Q.  And you understood at that time other provisions of that

24   agreement, unless changed by the supplement, remained in

25   effect, correct?
```

1   A.  Counselor, I would not argue with that.  They should be.

2   Q.  OK.  And you were given a new position at this time,

3   correct?

4   A.  That is correct.

5   Q.  And it was -- section 1.1 says the employee is hired in

6   management in a position of vice president, correct?

7   A.  Correct.

8   Q.  And under a little bit -- second paragraph after that --

9   there is an addition to Section 1.6 of the earlier agreement,

10  correct?

11  A.  Correct.

12  Q.  And it says "the activity of the vice president shall be

13  directed in performing representative functions of the company

14  in connection with foreign investors and funds," correct?

15  A.  Correct.

16  Q.  That was one of the activities you undertook as the deputy

17  CEO, correct?

18  A.  As the deputy CEO, I was in charge of evaluating the

19  performance.

20  Q.  Of foreign investors and funds.

21  A.  Of foreign investor -- investments and funds.

22  Q.  And the next section says "the powers," and then it has a

23  parentheses, "rights and obligations," close parentheses, "of a

24  vice president while he is performing his functions are

25  determined by the regulation on the president and vice

F6HAPOTHps                    Aliev - direct

1   president of Interros Holding Company, CJSC."  See that?

2   A.  Yes.

3   Q.  Did you request access, or did you request a copy of that

4   regulation at the time you received the agreement?

5   A.  I didn't, counselor.  At this point it was just an honorary

6   title.

7   Q.  This was a title that you -- you asked to retain a title,

8   though, correct?

9   A.  As I explained to you, the reason for that, correct.

10  Q.  And did you ever look at the regulation on the president

11  and vice president?

12  A.  As part of preparing for this motion, I have, but not prior

13  to that.

14  Q.  And when you contacted -- you said you contacted, I think,

15  Mr. Potanin and Ms. Zakharova.

16  A.  In reverse order, yes.

17  Q.  I'm sorry?

18  A.  In reverse order.

19  Q.  In October of last year, correct?

20  A.  Correct.

21  Q.  And did you reference the regulation in your discussion

22  with them?

23  A.  Counselor, I did not.  I have said the following things.

24  For clarity I think it would be very relevant.  I have called

25  Marianna, who is my prime point of contact at Interros, and

1  have said that I have been subpoenaed by a U.S. New York

2  district court to produce --

3          THE COURT:  Sir, the question was, "In your

4  conversations with them, did you make reference to the

5  regulations on the president and vice president of Interros

6  Holding Company, CJSC?"

7          THE WITNESS:  I did not.

8  Q.  And is it your testimony that when you were asking about

9  the subpoena, that you didn't seek to inform yourself about the

10 regulation?

11 A.  I sought the advice of counsel, counselor, and I did, as

12 was suggested.

13 Q.  OK.  My question is a little different.  Did you try to

14 inform yourself personally about what your rights and

15 obligations were under the regulation when you contacted these

16 Interros folks about the subpoena?

17 A.  Counselor, I did the best I could.  I informed myself as

18 best I could.

19         THE COURT:  That's a yes, no, or I don't remember

20 question.

21         THE WITNESS:  I don't remember.

22 Q.  When do you remember the first time looking at the

23 regulation?

24 A.  When I was preparing for this motion.

25 Q.  When you say "for this motion," are you saying preparing

1    for this hearing?

2    A.   After I have contacted Ms. Zakharova and Mr. Potanin.

3    Q.   OK.  So you didn't discuss this with Mr. Potanin or

4    Ms. Zakharova.

5    A.   No.

6    Q.   Can you turn to Exhibit 2 of the large binder, the Joint

7    Exhibit.  Now, if you turn to Exhibit 2, the first part is in

8    Russian.  And then I'm looking at three pages in, Mr. Aliev, at

9    the translation.

10   A.   All right.

11   Q.   That is the regulation on president and vice presidents of

12   Interros Holding Company, correct?

13   A.   Correct.

14   Q.   If you look at Section 3.3, that talks about, it says "for

15   purposes specified in clause 3.1 herein, the vice president of

16   the company shall" -- do you see that?

17   A.   I'm looking at it.

18   Q.   Yes.  Am I correct?  Did I get that right?

19   A.   You're referring to 3.3, the first line, right?

20   Q.   Correct.

21   A.   Yes.  I'm looking at it.  What's the question?

22   Q.   And the language is, "for purposes specified in clause 3.1

23   herein, the vice presidents of the company shall," right?  Do I

24   have that language right?

25   A.   Translate -- I don't want to argue about the specifics of

F6HAPOTHps                     Aliev - direct

1   the translation, whether it's "shall" or "is directed to," etc.

2   We don't want -- there is a semantic attribution here.

3   Q.  Right.  And then at 3.1, which is being referred to, that

4   section says, "The activities of the president and vice

5   president shall be aimed at performing the function of

6   representing the company."  Correct?

7   A.  "If directed to," is the literal translation.

8   Q.  That's the translation that you would adopt, is that

9   correct?

10  A.  "Is directed to."

11          THE COURT:  Is directed to performing the functions?

12          THE WITNESS:  Correct.

13  Q.  And then likewise in 3.3, you would change the translation,

14  "the vice president of the company is directed to"?

15  A.  I am not a professional translator, especially a legal

16  translator.  But it says "to the benefit of the aims stated in

17  3.1."  Comes out a little wonky, but --

18          THE COURT:  Counsel didn't ask you that.

19          THE WITNESS:  Um, "shall" would probably be the

20  closest.

21  Q.  "Shall" would be the closest, OK.

22  A.  Right.

23  Q.  And one of the things that vice president shall do, in that

24  first bullet point, is represent the company in relation to

25  public authorities.  Is that correct?

F6HAPOTHps                    Aliev - direct

1    A.  Government authorities.

2    Q.  So you would take issue, it would be some form of

3    government authority?

4    A.  If you're ask -- I don't know what detail of this is going

5    to become topical, so I'm trying to be as precise as possible.

6    No issue.

7    Q.  No issue with, government or public should be fine, in your

8    view.

9    A.  Probably.

10   Q.  And then if you go down four more bullet points, to the

11   last one on the English translation, that would be, "The vice

12   presidents of the company shall participate in negotiations

13   with major contract -- with major counterparties and partners

14   in Russia and abroad."  Do you see that?

15   A.  Which one?  I'm sorry?  Which --

16   Q.  It is the --

17          THE COURT:  Last line on page 2.

18   Q.  -- last line on page 2, the sixth one in the Russian

19   translation, in the Russian version.

20   A.  Got it.

21          Read the translation to me, please?

22   Q.  Sure.  "Vice presidents of the company shall," and then the

23   language is "participate in negotiations with major

24   counterparties and partners in Russia and abroad."

25   A.  Correct.

F6HAPOTHps                    Aliev - direct

1   Q.   OK.   So is it fair to say that these were the obligations

2   that were imposed upon you in connection with the regulation?

3   A.   In order to be precise -- and I don't want, again, to make

4   this any murkier than it is -- the translation is that this is

5   what vice presidents do, whether it's a "shall" or what they do

6   or are directed to do.   I don't think I should be the opinion

7   leader on that.   This is what vice presidents can do, according

8   to this document.

9   Q.   I thought we had settled upon, you said that we talked

10  about "is directed to" and "shall," and you said "shall" was

11  the proper translation.

12  A.   Sir, I am not a professional translator, but if the

13  semantic attributions of meaning are relevant here, then I

14  would not take a view on how this should be translated.   We

15  should get a forensic linguist here to attest, if this is going

16  to become an issue.   I'm trying to be very helpful, but I don't

17  want to concur with something.   So let's, if this is relevant,

18  what the nature of these words are and the translations

19  thereof, then somebody else should probably take a view on

20  that.

21          But this is, it is clear from this document that this

22  is what vice presidents can do.

23  Q.   I understand what you're saying.   I'm just asking you about

24  the language that you testified to.   You said it was "shall."

25  And I want to understand if you're taking that back now and you

1  think the word ought to be "can do."

2  A.  And, sir, for the third time I ask you not to put words in

3  my mouth.  I have just explained to you that if the detail of

4  the translation here is going to matter, then you should take

5  an independent forensic linguist to translate this for you.

6  I'm telling you what I understand this document to mean.

7  Q.  And you don't, you have no information about your counsel

8  objecting to this translation, do you?

9  A.  I have no information.

10  Q.  And you're not objecting to this translation right now, are

11  you?

12  A.  We can go in circles forever.  I just said what I believe,

13  what this document is taken to mean.  I believe that it is

14  clear from this document that vice presidents can do that.

15  Whether they shall, will, or are supposed to be directed to

16  perform these functions is open to interpretation, and I'm not

17  the judge of that.

18  Q.  So is it your testimony as you sit here today that you

19  don't know whether this required you to perform certain

20  functions?

21          MR. CARDOZO:  Objection.  I think we're now having a

22  legal argument, your Honor, not, not a translation argument.

23          THE COURT:  The witness started it.

24          You may answer, sir.

25  A.  Please repeat the question?

F6HAPOTHps                    Aliev - direct

1    Q.  So is it your testimony today that you just don't know

2    whether you are require to perform any of these functions?

3    A.  I was not required to do anything.  I asked for the title

4    in order to have a credential.  I did not look at this document

5    at the time when I signed this agreement.

6    Q.  And you did not look at the document when you asked

7    Ms. Zakharova and Mr. Potanin about complying with the

8    subpoena, correct?

9    A.  As I have said, I did not look at the document at the time,

10   and I do not -- did not refer to it.

11   Q.  And in fact if you look at Exhibit 6 -- and Exhibit 6 is a

12   Joint Exhibit list -- there is a single-page document, two

13   pages in Russian, front and back in my book, and then there is

14   the English translation.  Do you see that, sir?

15   A.  I am looking at both the Russian and the English

16   translation, correct.

17   Q.  And this is a formal response that you received from

18   Mr. Barbashev of Interros with respect to the documents that

19   were requested.  Correct?

20   A.  This came through as an attachment in Marianna's response

21   e-mail to my request.

22   Q.  And do I have the date of that correct, that that's October

23   8, 2014?

24   A.  I believe that is correct.

25   Q.  And Mr. Barbashev is saying that he has carefully

F6HAPOTHps                    Aliev - direct

1    considered –– that "we have carefully considered your request

2    to provide documents," correct?

3    A.  Can you point out to me the paragraph, please?

4    Q.  I'm pointing to the very first paragraph, under the words

5    "dear Mr. Aliev."

6    A.  Yes.  That's what it says.

7    Q.  You didn't see Mr. Barbashev reference the regulation in

8    this response, did you?

9    A.  Could I please read the document quickly?

10   Q.  Sure.  To help you out, I see a reference to a regulation

11   in the final paragraph on the first page of the exhibit, in the

12   English translation.

13   A.  It is referencing a bunch of regulations, yes.

14   Q.  All right.  When you see the reference to the regulation

15   that we've just been talking about that was Exhibit 2 ––

16              MR. CARDOZO:  Objection.

17              THE COURT:  Sir?

18              MR. CARDOZO:  I'm not trying to mislead you, but there

19   is a specific reference at the bottom of the page to

20   regulations.

21              THE COURT:  On the first page, right?

22              MR. CARDOZO:  Yes, your Honor.

23              THE COURT:  I think counsel just called the

24   witnesses's attention to that two questions back.  I think he

25   said "to help you out, there is a reference to a regulation in

F6HAPOTHps                    Aliev - direct

1    the last paragraph on page 1."  I believe he said that.

2              MR. CARDOZO:  I'm sorry.  I thought he was referring

3    to the first sentence of that.

4              THE COURT:  I'm sorry, sir.  I'm sorry, Mr. Cardozo, I

5    just didn't hear what you said.

6              MR. CARDOZO:  I'm sorry.  I apologize.  I thought he

7    was referring to the initial reference to "regulation," rather

8    the one on the very second to third, or last line of the page.

9              MR. GEERCKEN:  Thank you, Michael.

10   Q.  That is in fact what I was referring to, Mr. Aliev.

11   A.  Sorry.  Can you repeat that again?

12   Q.  Yes.  Can you look at the regulation that's referenced on

13   the last, second-to-last line, at least of the English

14   translation.  That's the regulation on commercial secrets and

15   confidential information of the company, dated December 31,

16   2002, correct?

17   A.  Regulations and commercial secrets and confidential

18   information of the company dated December 31, 2002.  And what

19   does it say in Russian?

20              So it does reference internal regulations of the

21   company, and that's what it says in Russian.  The articles of

22   association and internal regulations of the company.  So that

23   is, I guess, a reference to the -- could be construed as a

24   reference to the internal regulations on vice presidents.

25   Q.  But you don't see a specific reference to the internal --

F6HAPOTHps                    Aliev - direct

1    to the regulation on the vice president and president, do you?

2    A.  Yeah.  I'm not sure exactly whether they constitute --

3    whether there is a company rulebook or --

4            THE COURT:  Sir, it's an easy question.  You don't see

5    a reference to the regulations on vice presidents, do you?

6            THE WITNESS:  I don't.

7            THE COURT:  All right.

8    Q.  OK.  And you didn't ask Mr. Barbashev afterwards why he

9    didn't reference that, correct?

10   A.  Well, I believe this is referring to that regulation.  It

11   just doesn't call it by that name.  It said -- it refers to

12   internal regulations of the company.

13   Q.  And did you seek to clarify that with Mr. Barbashev after

14   you received that letter?

15   A.  I have not.

16           THE COURT:  I'm sorry.  What are you saying refers to

17   the internal regulations?

18           THE WITNESS:  This letter refers to the articles of

19   association and --

20           THE COURT:  Where is that, please, sir, on the English

21   translation?

22           THE WITNESS:  Fourth line from the bottom on the first

23   page.  Articles of association and internal regulations of the

24   company.

25           THE COURT:  OK.

F6HAPOTHps                    Aliev - direct

1              THE WITNESS:  And internal regulations of the company,

2     I don't want to infer, but most likely refers to the regulation

3     on vice presidents.  That's why I was a little bit hesitant in

4     answering this, because...

5     Q.  And so you don't see a specific reference to it, but you

6     say that the regulations might have encompassed that, and I

7     guess my question to you is, did you seek to clarify that with

8     Mr. Barbashev?

9     A.  And my answer is, no.  This came after my conversation with

10    both Marianna and Mr. Potanin.

11    Q.  I would like to draw your attention to Exhibit 1.

12    A.  Same binder?

13    Q.  The same binder, big binder, that's correct.  And there are

14    a couple of pages in Russian, followed by a legal -- a

15    translation of a legal opinion.  Do you see that?

16    A.  Correct, yeah.

17    Q.  And this is a legal opinion by Mr. Lisitsin Svetlanov; is

18    that correct?

19    A.  That's what the document says.

20    Q.  And do you know who Mr. Svetlanov is?

21    A.  I have no idea.

22    Q.  Do you know that he is an attorney at the YUST Law Firm,

23    Y-U-S-T?

24    A.  I don't know who he is, other than he clearly is a

25    signatory to this opinion.

F6HAPOTHps                    Aliev - direct

1    Q.  Did you try and find out whether he had any connection with

2    Mr. Potanin, prior to obtaining this opinion?

3    A.  No.

4    Q.  Do you know that the YUST Law Firm represents Mr. Potanin?

5    A.  I don't know.

6    Q.  Taking a look at this document, the first paragraph says,

7    "This is a legal opinion that has been prepared in response to

8    a letter received from CJSC Interros Holding Company, dated

9    October 3, 2014."  Do you see that first paragraph?

10   A.  Right.

11   Q.  And this relates to your issue that you raised about

12   obtaining information responsive to the Court's order, correct?

13   A.  I can't speak on behalf of Interros.  It's dated after my

14   call to Ms. Zakharova.

15   Q.  And did you review this when you received it?

16   A.  This is addressed to Mr. Barbashev.  I don't believe I have

17   received this.

18   Q.  Did you ever see this document before, sir?

19   A.  I don't believe I have.

20   Q.  Do you see a reference to the regulation in this legal

21   opinion?  And I'm referring to the regulation on presidents and

22   vice presidents of Interros.

23   A.  This is a document that I don't have any memory of, so if

24   you don't mind I'll just take a second.

25   Q.  That's fine.

F6HAPOTHps                        Aliev - direct

1    A.   (Pause)  It appears that this document refers to a body of

2    Russian law on similar cases, but not to Interros's internal

3    regulation.

4    Q.   Thank you, sir.

5    A.   A lot of case law references, though.

6    Q.   Sir, I just wanted to check with you.  Your employment

7    agreement with Interros is not terminated; is that correct?

8    A.   Did you say is now terminated or it's not terminated?

9    Q.   I'm sorry.  Has your agreement with Interros terminated?

10   A.   I believe not.

11   Q.   That's still in effect, then, correct?

12   A.   I believe so.

13   Q.   I'd like to draw your attention to Joint Exhibit no. 7.

14   A.   Looking at it.

15   Q.   OK.  Is this an exchange that you had with an Interros

16   employee or representative on or about July 9, 2009?

17   A.   I believe so.

18   Q.   And this, you received this in connection with performing

19   services for Interros; is that correct?

20   A.   Correct.

21   Q.   And this was designated by your counsel as confidential

22   information.  Do you see that?

23   A.   Correct.

24   Q.   And this was at a time when you were the deputy CEO of

25   Interros responsible for, among other things, monitoring

F6HAPOTHps                          Aliev - direct

1   foreign investments, correct?

2   A.  2009, at around this time, I was transitioning to my

3   position at Altpoint, but I was a deputy CEO of Interros, and

4   this could well have been a confidential exchange, correct.

5   Q.  And it was at a time when one of your duties was

6   representing the company with respect to foreign investments,

7   correct?

8   A.  Correct.

9   Q.  Likewise, if you turn to Joint Exhibit 8 --

10  A.  Joint Exhibit?

11  Q.  No. 8.

12  A.  No. 8, yes.  An e-mail dated 2009, correct?

13  Q.  That's correct.

14  A.  Yes.

15  Q.  And that was an exchange you had with Mr. Lebedev from

16  Interros, correct?

17  A.  It appears so.

18  Q.  And he provided you some additional confidential

19  information in the form of a draft related to a purchase

20  transaction, correct?

21  A.  It is a term sheet on a sale or a purchase; is that

22  correct.

23  Q.  Correct.  And you believe this might have been confidential

24  information, correct?

25  A.  It could well have been.

F6HAPOTHps                    Aliev - direct

1    Q.  And under your agreement -- we looked at your agreement --

2    you had an obligation to maintain the confidentiality of

3    confidential Interros information, correct?

4    A.  Correct.

5    Q.  And Pharanco, a company that he was referenced in the

6    purchase transaction document -- do you see that?  To Pharanco

7    Holdings, on the second page of the document?

8    A.  Looking at it.

9    Q.  That is an entity that is affiliated with Mr. Potanin,

10   correct?

11   A.  Sir, I have no idea what that entity is.

12   Q.  You have no idea that Pharanco, a Cyprus entity, is owned

13   by Mr. Potanin?

14   A.  As I said, I don't know what the legal structure is.  This

15   document could well be that, or it could be anything.  As I sit

16   here today, I have no idea what the company is, whatsoever.

17   Q.  At the time did you believe you had an understanding of

18   what Pharanco was?

19   A.  Sorry.  I don't remember what my understanding was in 2009.

20   Q.  And you don't know if I looked that up on Google and I

21   found out that Mr. Potanin was an owner of that, you don't know

22   whether that would be correct or incorrect?

23   A.  Sir, I don't know what's out there on Google.  It could

24   well have been.  I would not argue with anything you say.

25   Q.  I'd like to draw your attention to Exhibit 9.

F6HAPOTHps                    Aliev - direct

1    A.   Looking at it.

2    Q.   And there is an e-mail that you received from Yahoo.  And

3    it was sent to you.  Do you have any understanding as to who

4    sent that to you?

5    A.   The 2009 e-mail talks about a transaction between Interros

6    and a French bank.  The document doesn't say who sent this to

7    me.  It could be anybody.

8    Q.   And the French bank was Société Générale, right?

9    A.   Precisely.

10   Q.   And this is labeled as confidential, correct?

11   A.   By the counsel, correct.

12   Q.   And you believe this may well be confidential information

13   of Interros, correct?

14   A.   May well be.

15   Q.   Likewise I'll draw your attention to Joint Exhibit 10.

16   This is an e-mail dated October 30, 2009 that Ilya Kosykh sent

17   to Gilles de Gasquet.  Forgive my French.

18            THE COURT:  G-i-l-l-e-s, de, Gasquet.

19   Q.   And you understood that Gilles was with Société Générale?

20   A.   Correct.

21   Q.   And Ilya Kosykh, do you know who he was?

22   A.   Interros employee.

23            THE COURT:  I'm sorry.  Is it I-l-y-a?

24            MR. GEERCKEN:  That's correct.

25            THE COURT:  K-o-s-y-k-h.

F6HAPOTHps                        Aliev - direct

1    Q.  And Mr. Kosykh reported to you in connection with this

2    transaction, correct?

3    A.  This was the time when I transitioned to run Altpoint.

4    Ilya Kosykh was an associate at Interros, "reporting" I guess

5    is a formal word, but we had exchange.

6    Q.  He was at Interros and he was reporting to you and

7    responding to your requests for information from time to time,

8    correct?

9    A.  I'm not sure if he was reporting to me, because I was not

10   at Interros at the time.  But I advised on this transaction.  I

11   continued to advise on this transaction for about a year after

12   I moved to the U.S.

13   Q.  We'll come back to that question, but for the time being,

14   this is an attached framework, or he attached a framework

15   agreement for Société Générale to consider; is that correct?

16   A.  I am copied on the e-mail that he sent to a principal

17   negotiator at Société Générale, and I am counsel for whoever.

18   And some Deutsche Bank bankers were copied alongside myself.

19             THE COURT:  Ms. reporter, would you read the question

20   back to the witness, please.

21             (Record read)

22   A.  Correct.

23   Q.  And this is labeled as confidential.  As you sit here

24   today, this may well have been confidential Interros

25   information.  Is that correct?

F6HAPOTHps                    Aliev - direct

1    A.  Could well have been confidential Interros information.

2    Q.  Joint Exhibit 11, can you turn to that, sir.

3    A.  Looking at it.

4    Q.  This is an e-mail from Mr. Kosykh again to you, this time

5    in November 2009, correct?

6    A.  Looks like it, yes.

7    Q.  And he's providing some time lines for the final phase of

8    capital increase.  Do you see that?

9    A.  Looking at it, yes.

10   Q.  And this is labeled as confidential information, correct?

11   A.  Yes.

12   Q.  And this could well have been confidential information of

13   Interros at that time, right?

14   A.  Could well have been.

15   Q.  Do you have any reason to believe that it was not

16   confidential information?

17   A.  I don't have any reason to believe one way or the other.

18   It could well have been confidential information.

19   Q.  Now, earlier -- well, let's turn to Joint Exhibit 14,

20   please.

21   A.  I am looking at it.

22   Q.  You have an e-mail to Mr. Kosykh at the time of the page.

23   And this e-mail is dated January 31, 2010, correct?

24   A.  Correct.

25   Q.  It regards proceeds to Interros.  And there you're asking

```
 1   for a short bullet-point summary of commercial points for VO.
 2   Do you see that?
 3   A.  Correct.
 4   Q.  And is that Vladimir, I forget --
 5   A.  That is an acronym that Russians would use, sometime to
 6   point to him, correct.
 7   Q.  Mr. Potanin, correct?
 8   A.  Correct.
 9   Q.  And if I understand it right, Russian often refer to the
10   first initial and the middle initial?
11   A.  Correct.
12   Q.  And is his middle name Oleg?
13   A.  Some declension of that.
14   Q.  So that clearly refers to -- you need that information from
15   Mr. Potanin, correct?
16   A.  Correct.
17   Q.  And you needed it the same day, correct?
18   A.  That's what this e-mail says.
19   Q.  And you wanted it in English, right?
20   A.  It says "can do" in English.  I'm not sure whether I'm
21   asking him to do it or I will do it.  I'm not sure.  Yes.
22   Q.  And does this refresh your recollection as to whether
23   Mr. Kosykh had to comply with certain of your requests?
24   A.  This is an e-mail exchange.  I asked -- you asked me if he
25   reported to me.  And that's the only point that I don't know.
```

1   But I was having an exchange with a junior associate at

2   Interros, correct.

3   Q.  And you expected him to comply with your request, correct?

4   A.  I asked him to.

5   Q.  Did you have an expectation that he would comply?

6   A.  I did.

7   Q.  In fact, in Joint Exhibit 15 -- that's dated January 31,

8   2010 -- you write back to Mr. Kosykh and you kind of chastise

9   him a little bit; he didn't give you what you wanted.  Is that

10  correct?

11  A.  It appears that I did chastise him.

12  Q.  That's not what you asked for.  And at the end you say,

13  "please pay attention to my question," right?

14  A.  It appears that that's what I said.

15  Q.  And you expected him to comply with your request.

16  A.  I had asked him to, yes, expected to.

17  Q.  And if you return to the regulation -- that's back at

18  Exhibit 2 -- you talk about that a little bit earlier.  Now I

19  draw your attention to page 3 of the translation.  And there,

20  in paragraph 3.5, it says, "The presidents and the vice

21  presidents of the company has the right to receive necessary

22  information and documents about the activities of the company,

23  and give company employees mandatory instructions that are

24  aimed at exercising the authority of the president and vice

25  president."  Do you see that?

F6HAPOTHps                    Aliev - direct

1    A.  That is correct.

2    Q.  And so when you gave an order as a vice president of

3    Interros that was consistent with the authority you were given,

4    employees were required to comply, correct?

5              MR. CARDOZO:  Objection.

6              THE COURT:  Sir.

7              MR. CARDOZO:  He was not a vice president at the time

8    that these e-mails were being exchanged.

9              THE COURT:  Mr. Geercken.

10   Q.  My question to you is that as a vice president of the

11   company, this document indicates you had the power to request

12   information necessary for performance of your duties, and

13   employees then had a responsibility to comply, correct?

14             MR. CARDOZO:  Objection.

15             THE COURT:  Same objection?

16             MR. CARDOZO:  Yes.

17             THE COURT:  Overruled.

18   A.  The document says in connection with my duties.

19   Q.  So is the answer yes?

20   A.  The answer is, the specifics of the question is, does the

21   document say that I have the right to receive information in

22   connection with the execution of my duties?  Then the answer is

23   yes.

24   Q.  Thank you, sir.  That's all I have for you right now.

25   A.  You're welcome.

F6HAPOTHps                    Aliev - cross

1              THE COURT:  Thank you.

2              Do you want a five-minute break?

3              MR. CARDOZO:  I would appreciate that, your Honor,

4    yes.

5              THE COURT:  Let's take five minutes, ladies and

6    gentlemen.  Thank you.

7              MR. GEERCKEN:  Thank you, your Honor.

8              (Recess)

9              THE COURT:  Earlier on, counsel, I think the witness

10   testified to the funds under management, and then testified as

11   to the percentage of Interros funds in those funds.  I thought

12   you told me that was confidential.  Is that right or not?

13             MR. CARDOZO:  I think the answer is yes, your Honor.

14             (Discussion held of the record)

15             THE COURT:  That answer will be put on a separate page

16   and sealed.

17             OK, Mr. Cardozo.

18             MR. CARDOZO:  Thank you.

19   CROSS EXAMINATION

20   BY MR. CARDOZO:

21   Q.  I would say good afternoon, Mr. Aliev, but we are just

22   right at noon.

23   A.  Good afternoon.

24   Q.  Before you went to work for Interros in 2008, I think you

25   testified that you had worked for Rosbank?

1   A.   That is correct.

2   Q.   For how long had you worked at Rosbank?

3   A.   Approximately five years.

4   Q.   And in what position?

5   A.   I was the deputy CEO of Rosbank in charge of investment

6   banking.

7   Q.   And where was Rosbank located?

8   A.   Headquartered in Moscow.

9   Q.   And then you, according to your testimony, you went to work

10   for Interros in 2008?

11   A.   That is correct.

12   Q.   We discussed, you entered into an employment agreement with

13   them at that time, right?  With Interros, when you went to work

14   for them.

15   A.   Correct.

16   Q.   And you started to say what your principal areas of

17   responsibility are.  Could you tell us that again.

18   A.   The principal areas of responsibility at Interros was

19   overseeing Interros's investments.

20   Q.   And you discussed the --

21   A.   And evaluating -- I'm sorry -- evaluating the performance

22   of those investments.

23   Q.   You discussed the Stone Tower aspect of that.  Is there any

24   other particular company that you paid particular attention to

25   as an Interros investment?

1    A.  Correct.  The Rosbank transaction.  It was a staggered,

2    tiered transaction that stretched in time, and I was involved

3    in that.

4    Q.  Could you explain that a little bit more.  What does that

5    mean, you were involved in that?

6    A.  I was instrumental in structuring the transaction when I

7    was a Rosbank executive, as somebody who possessed the

8    knowledge and the skills to run an investment banking

9    transaction.  That carried over to my employment at Interros,

10   so I paid particular attention to this transaction.  And even

11   when I transitioned to Altpoint, I continued to advise on that

12   transaction.  And some was more of an advisory capacity, but I

13   still was privy to that information.

14   Q.  I see.  Now, while you were at Interros in 2008, did you

15   have any authority to sign checks, any banking authority?

16   A.  None whatsoever.

17   Q.  Did you have power of attorney of any kind?

18   A.  None whatsoever.

19   Q.  Who reported to you while you were at Interros?

20   A.  I had two assistants and from time to time I had an

21   associate.

22   Q.  And then what happened after 2008, as far as your move?

23   A.  2009?

24   Q.  No.  In 2008, what happened?  Where did you go next?

25   A.  Having worked at Interros for about a year, and focusing on

1    the particular investment of their Stone Tower investment,

2    investments in Stone Tower funds and Rosbank, I transitioned to

3    manage the portfolio of companies in which Stone Tower

4    originally invested, as an Altpoint CEO.

5    Q.  And during the year 2009, where were you physically

6    located?

7    A.  During the transition year, there were a few

8    back-and-forths between Russia and New York.

9    Q.  Now, at Altpoint, you were the CEO?

10   A.  Correct.

11   Q.  And in the entity, who was the majority, who was making the

12   majority investments in the management company itself?

13   A.  The management company, I am the majority holder of the

14   company.

15   Q.  And what percentage interest does Interros have?

16   A.  10 percent, approximately.

17   Q.  Tell us a little bit more.  What exactly is your role?

18   What do you do on a day-to-day basis for Altpoint?

19   A.  The role was very similar to what any fund manager does.

20   Altpoint is a fund manager: attracts the funds from investors,

21   and then invests them as it sees fit, for the benefit of

22   producing high returns.  We buy and sell controlling and

23   non-controlling positions in companies.  Being a U.S. manager

24   in the United States, we have investments in Texas, we have

25   investments in just about every single state in the United

1    States.  We buy and sell these companies as we see fit.  That

2    is what fund managers do.  This is what I do at Altpoint as a

3    private equity fund manager.

4    Q.  And I think you testified that you from time to time report

5    to your investors.  Is that right?

6    A.  As any fund manager will have regular reporting

7    requirements and auditing financials.

8    Q.  And who besides people from Interros do you get this

9    information -- report to?

10   A.  To all investors in Altpoint.

11   Q.  Approximately how many entities are there?

12   A.  Entities are individuals.  A few tenths.

13   Q.  And one of the companies you report to is Interros?

14   A.  Correct.

15   Q.  And in your Altpoint hat, who do you deal with in Interros

16   on those issues?

17   A.  I deal with the general counsel, and like I mentioned

18   before, Interros has a controlling function, headed up by Olga

19   Zinovieva.  I deal with her and a subordinate of her who is

20   dedicated to evaluating the performance of Altpoint, somewhat

21   similar to what I used to do when I was at Interros.

22   Q.  So you dealt with Marianna, the general counsel?

23   A.  Deal with Marianna, the general counsel, often.

24   Q.  And you deal with the controller.

25   A.  Correct.

F6HAPOTHps                    Aliev - cross

1    Q.  And one of the controller's deputies?

2    A.  Correct.

3    Q.  Anybody else?

4    A.  Hardly ever anybody else.  And I talk to Mr. Potanin -- I'm

5    sorry, I have to mention this -- from time to time as well.

6    Q.  OK.  Now, you just, it was explained to Mr. Geercken, after

7    you arrived in the United States, you continued to do some work

8    for Interros; is that right?

9    A.  Very specifically, I was involved with advising on the

10   Rosbank transaction.

11   Q.  Now, Mr. Geercken showed you a number of documents -- I

12   think you've marked them Joint Exhibits 7 to 15 -- in a big

13   book.  Do you have that in front of you?

14   A.  Correct, yes.

15   Q.  Now, was there a particular transaction that each one of

16   those documents was relating to?

17   A.  Every single one of these documents refers to the Rosbank

18   transaction.  They are all congregated within a very short

19   period of time.  And they are all from six years ago, just as I

20   was transitioning into my Altpoint role, heading -- still had

21   some carryover responsibilities at the time.

22   Q.  And what was the reason, again, that you would look to, of

23   a Rosbank role for Interros?

24   A.  As I was a senior Rosbank executive, being there at the

25   outset of this transaction, this being a staggered and tiered

F6HAPOTHps                    Aliev - cross

1    transaction in time that took two to two and a half years, I

2    was probably qualified to advise on this transaction.  And I

3    took that responsibility.  And this is what I did in the

4    capacity of an Interros employee.

5    Q.  And at the time you were doing all this work for Interros

6    with respect to the Rosbank transaction, was that before or

7    after your title had changed from deputy CEO to vice president?

8    A.  That was before the title change.

9    Q.  I see.  Now, when did the, call this work for Rosbank,

10   transaction work then come to an end?

11   A.  At some point in 2010.  I was no longer involved at all.

12   Q.  Now, let me ask you to look at your employment agreement,

13   Exhibit 4.  Do you have that in front of you?

14   A.  Looking at it.

15   Q.  And subsequent to that, were there -- I think Mr. Geercken

16   asked -- were there amendments, supplements executed?

17   A.  There were supplements executed a few times after the

18   original agreement was signed.

19   Q.  And did those supplements, I don't know whether you can

20   tell us, did they change your salary at all?

21   A.  I went through the painstaking trouble to look at the

22   supplements, in preparation for this motion, and my salary

23   changed dramatically as I transitioned out of my Interros role.

24   And I can give you the numbers, if this is helpful.

25   Q.  One thing at a time.  So can you tell the Court, if you've

1    looked through Exhibits 4-A through 4-G, did your salary change

2    over time?

3    A.   That is correct.  It changed.

4    Q.   And now I ask you to take a look at Exhibit -- I'm sorry --

5    it's a smaller book.  Respondent's Exhibit J.  Do you see where

6    it says "respondent"?

7    A.   I am looking at it.

8    Q.   OK.  Do you know what that is?

9    A.   That is a tabular representation of my salary amendments.

10   Q.   And did you do calculations at my request to translate the

11   ruble figures in the various contract amendments to dollars?

12   A.   I went through every single ruble number with an

13   exchange-rate website and computed the equivalent dollar amount

14   for the salary.

15          MR. CARDOZO:  Your Honor, I would like to offer in

16   evidence Exhibit 4, or Respondent's Exhibit J.

17          THE COURT:  Counsel?

18          MR. GEERCKEN:  Your Honor, we're not going to fuss too

19   much about it, but I think there should be a proper foundation

20   laid for how this was prepared, what exchange rate was used.

21   We only saw this a couple days ago.  Subject to that we don't

22   have an objection, but we would like to hear how it was

23   prepared.

24   Q.   Mr. Aliev, could you tell us what you did to come up with

25   these rates that are on Exhibit J.

F6HAPOTHps                    Aliev - cross

1    A.  Right.  So, counselor, I am an investment banker by

2    training.  This is the simplest metric there is, is a foreign

3    exchange rate.  I looked at the government-run exchange-rate

4    website for all of the dates that my amendments came into

5    effect, and translated, based on the rates for every single day

6    on which the amendment was entered into, I computed those

7    dollar amounts based on the exchange rates -- the

8    exchange-rate-site tracker that is referenced here.

9             MR. CARDOZO:  I renew my offer, your Honor.

10            MR. GEERCKEN:  No objection, your Honor.

11            THE COURT:  Received.

12            (Respondent's Exhibit J received in evidence)

13   Q.  Would you look at Respondent's Exhibit K, the next one.

14   Could you tell us what that is.

15   A.  That is a graph of my -- a chart of my salary as an

16   Interros employee.

17            MR. CARDOZO:  I offer it into evidence as a

18   demonstrative exhibit, your Honor.

19            MR. GEERCKEN:  No objection, your Honor.

20            THE COURT:  Received.

21            (Respondent's Exhibit K received in evidence)

22   Q.  Now looking at Respondent's Exhibit K, can you, in your

23   words, was your salary going up or down over this period of

24   time?

25   A.  My salary overwhelmingly came down, from a 60,000-dollars-

F6HAPOTHps                    Aliev - cross

1   a-month equivalent to a 570-at-today's-rate-dollar-amount

2   equivalent; i.e., it came down by a factor of more than a

3   hundred.

4   Q.   Now going back to your Respondent's Exhibit -- the Joint

5   Exhibit, discuss me -- 4-H, what is your specified salary as of

6   January 2011?

7   A.   As of January 2011, my salary is specified and denominated

8   as 31,000 rubles.

9   Q.   And in today's rate, what would that be?

10  A.   Today's rate, this is approximately $575 per month.

11  Q.   When is the last time you collected any of this salary from

12  Interros?

13  A.   I don't remember, but not for the last three or four years.

14  Q.   Now, you say the Rosbank transaction ended sometime in

15  2010, the work on it?

16  A.   That is correct.

17  Q.   Have you done any work of any kind, as an Interros

18  employee, since your work on the Rosbank transaction ended

19  sometime in 2010?

20  A.   I have performed no work for Interros or any function of

21  any kind since the Rosbank transaction wound up.

22  Q.   And take another look at the exhibits that were marked

23  Joint Exhibits 7 to 15 that Mr. Geercken asked you about.  Have

24  you received any documents from Interros relating to your work

25  for Interros other than the kind of documents relating to

F6HAPOTHps                    Aliev - cross

1    Interros?

2    A.   Other than the kinds of documents that are attached as

3    exhibits in this binder, I have not received any other

4    documents or requests from Interros to perform any functions as

5    an employee.

6    Q.   And how much of your working time since the Rosbank

7    transaction concluded did you spend on -- as an Interros

8    employee?

9    A.   Exactly zero.

10   Q.   And where do you spend your time?

11   A.   I spend substantially all my time as an Altpoint manager,

12   managing tens of investments that we have entered as Altpoint

13   managers.  All of my time is dedicated to running a private

14   equity company.

15   Q.   When your title changed in August of 2010 to vice

16   president, from deputy CEO, in your mind was that a promotion

17   or a demotion?

18   A.   Not only it is a demotion; I viewed it as an honorary

19   title.  As I said, I performed no functions, and used that as a

20   credential, as I went about sourcing the business for a newly

21   formed company.

22   Q.   And August -- I'm sorry.  When you changed your title, when

23   your title changed, was that about at the time that your work

24   for Rosbank, the Rosbank transaction came to an end?

25   A.   That is about at that time.

F6HAPOTHps                     Aliev - cross

1   Q.  Now, how long have you known Mr. Potanin?

2   A.  I met him at some point when I worked at Rosbank, probably

3   during my tenure at Rosbank, the end of 2003 or 2004.

4   Q.  Mr. Geercken asked you about your social interaction with

5   him.  What kind of social interaction do you have with him?

6   A.  There are fairly formal interactions.  His office organizes

7   social events.  Every once in a while, for him personally, for

8   Interros, I receive a formal request from his office to attend,

9   and I R.S.V.P.

10  Q.  And do you call him up and say, hey, let's have a drink,

11  kind of thing?

12  A.  He is my largest investor, and it will be fair to say that

13  our relationship is friendly, but he is not somebody I'd invite

14  up to the Hamptons to hang out for the weekend, ever.

15  Q.  And when you had meetings with Mr. Potanin, do you meet him

16  on -- when you were work -- withdrawn.

17          In 2008 when you had meetings with Mr. Potanin, was

18  that on a regular basis?

19  A.  When I worked at Interros as a deputy CEO, it was fairly

20  regular.  We had meetings on business opportunities related to

21  what I was doing at Interros at the time.

22  Q.  And subsequent to that, when you had meetings with

23  Mr. Potanin, how did they come about?

24  A.  They come about at the request of his office, usually for a

25  reporting function at -- that relates to the performance of his

F6HAPOTHps                    Aliev - cross

```
 1   investments that I manage as an Altpoint manager.  But they
 2   come from his office.  I never initiate social contact.
 3   Q.  Now, he's an important business associate, right?
 4   A.  That is a fair statement.
 5   Q.  From time to time do you and Mr. Potanin have
 6   disagreements?
 7   A.  We do, quite often.  I have disagreements with him and his
 8   office.  As a fund manager, we're often in ferocious
 9   negotiations in issues related to managers' compensation and
10   fees and other structural issues, just like any investor would
11   with any fund manager.  We hire counsel, pay an enormous amount
12   of money to settle those arguments between Altpoint and
13   Interros.
14   Q.  You have hired the same or separate counsel?
15   A.  Separate counsel.
16   Q.  Why do you hire separate counsel?
17   A.  Because we -- it would be a conflict.  I am very mindful as
18   to the conflicts that ensue.  We are an SEC-registered U.S.
19   private equity fund.  We maintain our reputation.
20   Q.  Let me ask you to look at the small book, Respondent's
21   Exhibit A.  Can you tell us what that document is, what it
22   relates to?
23   A.  Respondent's exhibit?
24   Q.  Right.  In the small book.
25   A.  This is the exchange between me and Interros's controller,
```

F6HAPOTHps                    Aliev - cross

1    Olga Zinovieva, where we specifically argue about fees and

2    capital contributions and all the structural formative issues

3    with respect to the fund management.

4              THE COURT:  The name is Z-i-n-o-v-i-e-v-a.

5    Q.  And take a look at Respondent's Exhibit B.  Can you tell us

6    what that relates to.

7    A.  That is an exchange between me and an attorney at Interros,

8    where I think I emotionally argue some of the points, it

9    appears like, as they relate to my disagreements with Interros.

10   Q.  And look at Respondent's Exhibit C and tell us what that

11   relates to.

12   A.  This is a document that attests to how capital calls are

13   submitted to Interros in our function as the fund managers, and

14   we argue on the procedure for those, for that as well.

15   Q.  And finally Respondent's Exhibit 4-I -- Respondent's

16   Exhibit I, excuse me, a little bit further back in the book.

17   See that?

18   A.  I'm looking at it.

19             This is an argument about the fine points about how

20   our relationship with Interros -- about the document that

21   governs our relationship with Interros, in this particular

22   case, how the distributions are made and how the cash flows.

23   Q.  If you could just take a quick look back and tell us, when

24   were these e-mails exchanged?

25   A.  These e-mails, the last one is August of last year.  And

1    the prior ones.  And which one you're referring to, A and B.

2    So these were 2014 documents, last year.

3            MR. CARDOZO:  I offer Exhibits A, B, C, and I in

4    evidence.

5            MR. GEERCKEN:  No objection, your Honor.

6            THE COURT:  Received.

7            (Respondent's Exhibits A, B, C, and I received in

8    evidence)

9    Q.  Mr. Aliev, you conspired with Mr. Potanin to break the law?

10   A.  Sir, I would never do such a thing.  Let me take a

11   tangential excursion here.  We are U.S. fund managers.  The

12   team that I hired to work for me are graduates of major U.S.

13   universities who reside in the United States, who would never,

14   ever do anything to break the law.  And we are under the

15   supervision of a U.S. government body, the Securities and

16   Exchange Commission, live, at any time.  We would never do any

17   such thing.

18   Q.  But it is true that Mr. Potanin and Interros is a very

19   important company to Altpoint, right?

20   A.  Regardless, they're an important company, like any investor

21   would be important to us.  Without a question, it doesn't

22   change anything about what I said about our legal position.  We

23   treat our investors equitably and with respect.  Of course he's

24   important.

25   Q.  If mr. Potanin and Interros said to hell with Altpoint,

F6HAPOTHps                    Aliev - cross

1    would your company -- what would happen?

2    A.  It would be affecting the business in the interim, but we

3    are a very competent management team.  We would, like any fund

4    manager, we would go out and try to raise funds for our --

5    other funds from other investors.  We have enormous credentials

6    at this point to do -- to raise from individuals and

7    institutions in the United States or elsewhere.  We are one of

8    the top funds.

9              THE COURT:  Do you do that now?

10             THE WITNESS:  We do that -- to raise, we don't need to

11   raise.  But if something happened with Interros, we would

12   organize a roadshow and a capital-raising initiative, contact

13   an investment bank who would take us around and who would raise

14   funds to manage.  That's what fund managers do, all the time.

15   Q.  Now, you testified that you recalled that the subpoena in

16   this case was served sometime in February of 2014.  Do you

17   remember that?

18   A.  The original subpoena was served at that time, correct.

19   Q.  At that time, what did you ask -- Debevoise was then

20   representing you; is that right?

21   A.  Correct.

22   Q.  What did you ask Debevoise to do in connection with -- the

23   basic question, what did you ask them to do?

24   A.  I asked them to comply with what was ordered by the Court,

25   to turn over the responsive documents that we had in our

 1    possession.  This is the only thing we could have done, and

 2    this is what we instructed our counsel to do.

 3            MR. CARDOZO:  Your Honor, I would like to offer in

 4    evidence at this point Joint Exhibit 17, which is the

 5    declaration from the Debevoise attorney who produced those.  I

 6    don't believe there is any objection to that.

 7            MR. GEERCKEN:  No objection.

 8            THE COURT:  Received.

 9            (Joint Exhibit 17 received in evidence)

10    Q.  And to your knowledge -- and now I'm talking February --

11    were Altpoint documents produced at that time, documents from

12    the Altpoint server?

13    A.  To my knowledge, in response to the original subpoena,

14    Altpoint documents were produced at that time.

15    Q.  And at some point this time, you don't remember when, you

16    personally went through your personal e-mails; is that right?

17    A.  That is correct.

18    Q.  And what did you do with them?

19    A.  I typed in the responsive words into the search engine,

20    produced and printed out all the documents that came up, and

21    turned them over to counsel.

22    Q.  Now I want to go back to what were you doing for Interros

23    after this Rosbank transaction ended in 2010.  Since 2010, have

24    you received any confidential information from Interros of any

25    kind?

F6HAPOTHps                    Aliev - cross

1    A.  I've received exactly zero confidential information from

2    Interros, after the Rosbank transaction.

3    Q.  And were you given any tasks by Interros to perform since

4    2010?

5    A.  None whatsoever after the Rosbank transaction.

6    Q.  Are you a member of the Interros fraud committee?

7    A.  No.  No, I'm not.

8    Q.  Do you have a power of attorney from Interros?

9    A.  Not at all.

10   Q.  Do you have bank-signing authority of any kind?

11   A.  No.

12   Q.  Do you get board minutes?

13   A.  Never.

14   Q.  Did you get any financial statements from Interros?

15   A.  Never.

16   Q.  Are you an investor in Interros?

17   A.  No.

18   Q.  Are you a shareholder of any kind?

19   A.  No.

20   Q.  How many people since 2010 from Interros report to you?

21   A.  Not one.

22   Q.  Do you have any assistants at Interros?

23   A.  None.

24   Q.  When was the last time you had any assistance at all, from

25   Interros?

F6HAPOTHps                     Aliev - cross

1   A.  When I worked at Interros, since I transitioned to the U.S.

2   in 2009, I had no assistants at Interros.

3   Q.  Are you a boss of anyone at Interros?

4   A.  Not at all.

5   Q.  Now, you have an Interros e-mail account?

6   A.  I don't have an Interros e-mail account.

7   Q.  Did you ever have an Interros e-mail account?

8   A.  I did when I worked at Interros.

9   Q.  And did you learn whether or not that Interros account

10  exists today?

11  A.  When counsel was searching the documents for this motion,

12  it emerged that it was shut down a longtime ago, at some point

13  in 2011, and of course I have never used it since I moved to

14  the United States.  And at some point it was terminated.  But I

15  don't have it.

16  Q.  Do you have any access to Interros servers of any kind?

17  A.  None whatsoever.  It's physically impossible for me to do

18  anything.

19  Q.  Who is the head of what you would call the U.S., the IT

20  department at Interros?

21  A.  I have no idea.

22  Q.  Do you know any Interros IT employees?

23  A.  Not a single person.

24  Q.  Now, outside of the IT department and outside of

25  Mr. Potanin and Marianna, the general counsel, whom do you know

F6HAPOTHps                    Aliev - cross

1    at Interros today?

2    A.  I talk to Olga Zinovieva, the controller, and one of her

3    subordinates, who recently got hired to oversee their

4    investment in Altpoint.

5    Q.  Anybody else?

6    A.  Could be one-offs with maybe somebody from the controlling

7    function, but nobody else.

8    Q.  And do you physically, since 2010, do you physically go to

9    Interros from time to time?

10   A.  I do.

11   Q.  For what purpose?

12   A.  To report -- to submit our performance reports, as we are

13   required by the agreement that regulates our relationship,

14   which is called the limited partner agreement.

15   Q.  When you go to Interros for these meetings, do you go to

16   your office?

17   A.  I don't have an office.

18   Q.  You don't have an office at Interros?

19   A.  I don't.

20   Q.  When was last time you had an office at Interros?

21   A.  In 2008 and possibly for the beginning of 2009, and then I

22   left for New York.

23   Q.  Do you have a security card of any kind to get into the

24   building?

25   A.  No.

F6HAPOTHps                    Aliev - cross

1    Q.  When you go there, you have to show an ID or something?

2    A.  They don't know who I am.  I check in at the reception desk

3    and get a pass, and then a security guard comes from the

4    relevant office and ushers me upstairs.

5    Q.  Do you recall whether, when you worked at Interros in 2008,

6    was that the same situation, or security --

7    A.  No.  I had a security pass and I could enter the building

8    freely, as I was an employee, in Moscow.

9    Q.  Now, if you take a look at Joint Exhibit 4-I -- sorry --

10   4-H, I think it is --

11   A.  4-H?

12   Q.  I'm sorry.  4-G, the August 2, 2010 supplement.

13   A.  Looking at it.

14   Q.  Yes.  That's the document where you say you are now a vice

15   president -- it says you are now a vice president.  Is that

16   right?

17   A.  This is an amendment to the labor agreement.

18   Q.  And what does this document say as to where your place of

19   employment would be?

20   A.  It says that the place -- one second?

21   Q.  Section 1.2.

22   A.  1.2, the place of -- "for the employee, the following place

23   of employment is determined: city of Moscow."

24   Q.  And approximately how many times do you go to Moscow this

25   year to -- wearing your Altpoint hat?

F6HAPOTHps                   Aliev - cross

1    A.  Wearing my Altpoint hat, maybe two to three times a year.

2    Q.  And how many times do you go to Moscow wearing your

3    Interros hat?

4    A.  Never.

5    Q.  And all of this that you've just described -- that is, your

6    lack of involvement with Interros -- that's been true ever

7    since your work on the Rosbank matter came to an end?

8    A.  I'm sorry, repeat your question, please?

9    Q.  All of the questions I've just been asking as to what you

10   don't do for Interros, has that been true ever since the

11   Rosbank transaction came to an end?

12   A.  That is correct.  I have no Interros involvement since.

13   Q.  So is it fair to say that since -- withdrawn.  And the

14   Rosbank transaction came to an end sometime in 2010; is that

15   right?

16   A.  Correct.

17   Q.  Is it fair to say that since then you have done absolutely

18   nothing for Interros?

19   A.  Fair to say that.

20   Q.  Now, I now ask you to look again at Exhibit 4-G, your

21   August 2 document.

22   A.  I'm looking at it.

23   Q.  And you see it says 1.6 is added, that you're performing

24   representative functions of the company in connection with

25   foreign investors and funds.

F6HAPOTHps                    Aliev - cross

1    A.   That's what it says.

2    Q.   And since you signed this document, have you ever perform a

3    representative function on behalf of Interros in connection

4    with foreign investors and funds?

5    A.   I have not performed any functions on behalf of Interros

6    with connection -- in relation to foreign investments and

7    funds.   I am the fund manager, the third-party fund manager for

8    Interros.

9    Q.   That's wearing your Altpoint hat.

10   A.   That's wearing my Altpoint hat.

11   Q.   Now I would ask you, Mr. Aliev, to take a look at Joint

12   Exhibit 18.

13   A.   8?

14   Q.   18.  18.  Do you see that?

15   A.   I am looking at it.

16   Q.   Now, I would tell you that this is the expert report of the

17   Russian-law expert that the petitioner retained.  And I would

18   ask you to take a look at paragraph 32 of that document.

19   A.   Looking at it.

20   Q.   Let me just read you the middle of the first sentence:

21   "Mr. Aliev had to have access information about Interros's main

22   assets and deals."  See that?

23   A.   Correct.

24   Q.   Since 2010, have you had access to information about

25   Interros' assets and deals?

F6HAPOTHps                    Aliev - cross

1   A.  Only inasmuch as what they invest with me as a fund manager

2   at Altpoint.

3   Q.  New could you take a look at paragraph 34 of this document.

4   A.  Right.

5   Q.  Calling your attention to the first bullet point, did you

6   have access to documents and information through your Interros

7   e-mail, other e-mail accounts, and Interros document processing

8   system?

9   A.  I don't have Interros's e-mail.  I have absolutely no

10  possibility and no access to any of Interros's systems.

11  Q.  And continuing on, do you have control of those document

12  systems in the form of the ability to request to be provided

13  with access to business e-mails, document processing systems,

14  or other sources?

15  A.  I have had no need to have Interros documents.  So I don't

16  know.  But I have asked, when I was ordered to produce

17  documents, and my requests were rejected.

18  Q.  Going down to the bottom of this paragraph of page 11 of

19  the report, did you have control over documents and information

20  in the form of ongoing orders to employees requesting that you

21  be provided with documents and information?

22  A.  I have no such control.

23  Q.  Now I want to ask you some questions about the regulations

24  that Mr. Geercken referred you to.  That's Joint Exhibit 2,

25  again referring to 3.3, which is on the next page that we

F6HAPOTHps                    Aliev - cross

1   talked about.

2   A.  Right.

3   Q.  Since 2002 -- excuse me -- 2010, going down these

4   regulations in 3.2, did you represent Interros in dealing with

5   federal government agencies, local government agencies, media

6   outlets, public and non-commercial organizations, and Russian

7   and foreign legal entities and physical individuals?

8   A.  No, I have not.

9   Q.  Next bullet.  Did you participate in conceptualizing and

10  developing the company's corporate culture?

11  A.  Not at all.

12  Q.  Did you participate in conceptualizing and implementing a

13  system for motivating and stimulating company employees?

14  A.  No.

15  Q.  Did you participate in developing a system for consistent

16  interaction by company management or company management bodies

17  with company shareholders as well as other interested parties?

18  A.  Not at all.

19  Q.  Did you facilitate the formulation of the social dimensions

20  of the company activities and support positive public opinion

21  about the company?

22  A.  No.

23  Q.  Did you participate in negotiations with major

24  counterparties and partners with Russia and abroad, with

25  individuals occupying senior government posts in the government

F6HAPOTHps                    Aliev - cross

1    of the Russian federation and the government of the subjects of

2    the Russian federation, and participate in the activities of

3    non-commercial organizations, including public organizations?

4    A.  I have not.

5    Q.  And have you exercised any other authority in connection

6    with your company chartering and employment contracts?

7    A.  Exercised no authority in that connection.

8    Q.  Now I want to ask you, you say that it was not until

9    September that you realized you were under an obligation to try

10   to get the documents in Russia from Interros.  Is that right?

11   A.  That is correct.

12   Q.  And after you learned that fact, what is the first thing

13   you did?

14   A.  The first thing I did is that I hired counsel that's

15   independent from the Altpoint corporate representation,

16   Proskauer.

17   Q.  And in that connection, do you recall asking Proskauer to

18   retain a Russian lawyer on your behalf?

19   A.  I don't recall authorizing it, but I sought your -- I

20   sought the advice of the counsel as to what I could do.

21   Q.  And do you know whether or not a Russian lawyer has in fact

22   been retained?

23   A.  I know a Russian lawyer has in fact been retained now.

24   Q.  Turning now to the fall of 2014, who was the president of

25   Interros?

F6HAPOTHps                    Aliev - cross

1   A.  2014, Mr. Potanin was the president of Interros.

2   Q.  And who was the principal investor?

3   A.  The principal -- beneficial investor is Mr. Potanin.

4   Q.  And who is the CEO?

5   A.  Mr. Barbashev.

6   Q.  And who is the general counsel?

7   A.  Marianna Zakharova.

8   Q.  Did you, when you learned that you had to make this

9   personal effort, did you check your e-mail, your Interros

10  e-mail?

11  A.  I don't have an Interros e-mail, so that there is exactly

12  nothing to check.

13  Q.  Did you call the IT person at Interros?

14  A.  I don't know anybody at IT at Interros.

15  Q.  So what is the first thing you in fact did after you

16  learned that you had to make further effort?  What's the first

17  thing you personally did, other than hire Proskauer?

18  A.  I hired counsel and I sought advice, and I was trying to be

19  as cooperative and as helpful as I possibly could.  There was

20  no --

21  Q.  Personally -- excuse me for interrupting.

22  A.  Sorry.

23          THE COURT:  Counsel asked you what you did.

24  Q.  Other than hiring --

25  A.  I was bewildered, to be honest with you.

1           THE COURT:  What did you do?

2     Q.  Did you make any phone calls?  Did you make any phone

3     calls?

4     A.  I have done the only thing that a reasonable person in my

5     position could have done in answering the additional motion.

6     I've called the two people who I talked to at Interros and

7     Marianna, and I went in some detail with her as to the nature

8     of the motion that was subsequently filed against me.

9     Q.  Let's do this one at a time.  So with respect to the call

10    from Marianna, do you remember when that was?

11    A.  Very early October.  October 1.

12    Q.  I call your attention now to Joint Exhibit 5 in the big

13    book.  Can you tell us what that is?

14    A.  This is an e-mail that I sent to Marianna to follow up on

15    my phone call.

16    Q.  So approximately what time in October did you have a

17    telephone call with Marianna?

18    A.  That same day.

19    Q.  Now, to the best of your recollection, what is it that you

20    said to Marianna during that phone call and what did she say in

21    response?

22    A.  To the best of my recollection, I said -- I explained to

23    her that I received an order from a U.S. district court to

24    produce Interros documents.  I have explained to her that I

25    could face severe consequences, including going to prison, for

F6HAPOTHps                    Aliev - cross

```
 1    not complying with the court order.  I have asked her if there
 2    is any ability for me to access those documents.  And she
 3    flatly, manifestly denied all of my requests.
 4          I have then told her that my counsel will be -- my
 5    counsel would be calling her.  And I have also told her that I
 6    will go to Mr. Potanin to try to have him overrule her
 7    decision.
 8    Q.  Did you ask her to explain to Mr. Potanin that you might be
 9    calling?
10    A.  I don't remember whether I have asked specifically.  I told
11    her that I will be calling him directly.
12    Q.  And after that phone call was concluded, you sent this
13    e-mail?
14    A.  Correct.  Then I sent the e-mail.
15          MR. CARDOZO:  I offer it in evidence.
16          MR. GEERCKEN:  No objection.
17          THE COURT:  Received.  5.
18          MR. CARDOZO:  Joint Exhibit 5.
19          (Joint Exhibit 5 received in evidence)
20    Q.  Now, you say you also called -- withdrawn.
21          Did you at some point in time receive the letter that
22    we've reviewed from Mr. Barbashev to you?
23    A.  Correct.  About a week later Marianna responded, I believe
24    to this e-mail, attaching a letter from the CEO of Interros.
25    Q.  And did you know -- you had not spoken personally with
```

1   Mr. Barbashev; is that right?

2   A.  I had not.

3   Q.  And bottom line, this letter says, you're not going to get

4   the documents; is that right?

5   A.  It's rather clear.  He told me that I had no right to even

6   make such a request, or to get -- or that I will -- that I was

7   able to get the documents.  Correct.

8   Q.  Will you take a look at Respondent's Exhibit H, in the

9   small book.  Do you recognize that document?

10  A.  This is Marianna's e-mail to me in response to my e-mail

11  that I sent to her after the phone conversation.

12  Q.  And what letters does she attach to that?  The attachment

13  to that e-mail?

14  A.  The attachment to that e-mail was the letter signed by

15  Interros's CEO, Mr. Barbashev.

16  Q.  OK.  Now, you say that in addition to your communications

17  with Marianna, you also had conversations with Mr. Buchanan.

18  Is that right?

19  A.  Correct.  I called him too.

20  Q.  And what happened with that phone call?

21  A.  It was a substantially similar conversation to the

22  conversation I had with Marianna.  I informed him that I have a

23  U.S. court order to produce Interros's documents.  I have

24  explained to him the consequences that I may face if I don't

25  comply.  And he told me -- he was sympathetic -- he said that

F6HAPOTHps                    Aliev – cross

1    he was hoping that the U.S. court will understand that you have

2    no physical or legal ability to obtain such documents and that

3    my request will be rejected.  That's all there was.

4    Q.  During your call with Marianna, I think you said you told

5    her that I would be calling her as well; is that right?

6    A.  Correct.

7              MR. CARDOZO:  Your Honor, I would like to call your

8    attention to Joint Exhibit 16.

9              THE COURT:  Yes, sir.

10             MR. CARDOZO:  Which is my declaration.

11             THE COURT:  Yes, sir.

12             MR. CARDOZO:  I would like to offer, at this point in

13   time, I would like to offer that document in evidence.

14             MR. GEERCKEN:  Your Honor, I have no objection.  My

15   understanding is that all the Joint Exhibits are in evidence.

16             MR. CARDOZO:  I was just -- thought the chronology

17   would be helpful.

18             THE COURT:  OK.  All the Joint Exhibits are received.

19             MR. CARDOZO:  OK.  Thank you, your Honor.

20             (Joint Exhibits received in evidence)

21   Q.  Mr. Aliev, I wanted to, for a few minutes, refer back to

22   that extra report, to Joint Exhibit 18.  Do you have that

23   again?

24             THE COURT:  18?

25             MR. CARDOZO:  18, yes.

F6HAPOTHps                    Aliev - cross

1   Q.  Do you have that?

2   A.  I am looking at it.

3   Q.  All right.  I ask you to take a look now at paragraph 36,

4   the first subparagraph.  Did you request employees of Interros

5   for the electronic or paper-based documents, processing system?

6   A.  I don't have any employees of Interros.  I called the GC.

7   Q.  And did you seek access to the business e-mails of

8   Interros?

9   A.  I have no e-mail account at Interros, so I could not have

10  physically done so.

11  Q.  And who at Interros could you -- did you know who you could

12  have called besides Marianna and Mr. Potanin?

13  A.  The only -- I would like to emphasize, this is a very

14  formal relationship.  I talked to general counsel.  I talked to

15  the controller.  And from time to time I talked to Mr. Potanin.

16  I never talked to anybody else.  I don't know hardly anybody

17  else.

18  Q.  Have you filed any legal proceedings of any kind against

19  Interros?

20  A.  I sought the advice of counsel, but I did not file any

21  legal proceedings against Interros.

22          MR. CARDOZO:  Just a housekeeping matter.  Your Honor,

23  I think I neglected to offer in evidence Respondent's Exhibit

24  H, which we referred to a moment ago, which is the transmittal

25  letter from -- response to Marianna and attaching.

F6HAPOTHps                    Aliev - redirect

1          MR. GEERCKEN:  No objection, your Honor.

2          THE COURT:  Received.

3          (Respondent's Exhibit H received in evidence)

4     Q.  Mr. Aliev, if the Court today orders you to take further

5     steps to obtain these documents, what would you do?

6     A.  Counselor, I will be very entirely frank with you.  I would

7     be at a complete loss.  I wouldn't know what to do.

8     Physically, humanly, legally possible.  I have exercised any

9     and all authority I have as an -- I don't, as an Interros

10    employee, I have asked for the documents.  I have called the

11    general counsel.  I have called the top guy at Interros.  I

12    have no idea what else I could physically do.  It's as simple

13    as that.  I would like to be very helpful but I can't.

14         MR. CARDOZO:  Thank.

15    Q.  Thank you.

16         MR. CARDOZO:  No further questions, your Honor.

17         THE COURT:  Redirect, counsel?

18         MR. GEERCKEN:  Yes.  May I have a few minutes?

19    REDIRECT EXAMINATION

20    BY MR. GEERCKEN:

21    Q.  Mr. Aliev, you've talked a little bit about your

22    relationship with Mr. Potanin today.  You have a social

23    relationship with him, correct?

24    A.  As I have said, social contact was initiated by him.

25    Q.  Right.  And you have a friendly relationship with him,

1    correct?

2    A.   Friendly relationship.

3    Q.   And you were invited to the birthday party and other

4    gatherings that you went to with him?

5    A.   His office invites me to social functions, correct.

6    Q.   If I draw your attention to page 38 of your transcript --

7    A.   What exhibit is that?

8    Q.   That was your deposition transcript.

9    A.   Oh, this, OK.  Page 38?

10   Q.   That's correct, sir.

11   A.   Looking at it.

12   Q.   Beginning with line 2, can you read lines 2 through 19 into

13   the record.

14   A.   "Q. When did you begin to see or have social interactions

15   with Mr. Potanin?

16   "A. I think, as he respected me more in business, he felt

17   probably more comfortable with having me at social function.

18   "Q. And was that sometime while you were still in Moscow?

19   "A. We hardly had any contact while I was in Moscow outside of

20   the office.

21   "Q. That really developed more so after you left Moscow.

22   "A. After I left Moscow, I was invited to his birthday party

23   and for gatherings that he has at Interros, and it will be

24   outside the office, off-site meetings in France or something

25   like that."

F6HAPOTHps                    Aliev - redirect

1    Q.  OK.  And that testimony was accurate at the time you gave

2    it, correct?

3    A.  Correct.

4    Q.  And in fact, after you left Moscow, you agreed to hire

5    Mr. Potanin's son at Altpoint, correct?

6    A.  He suggested that I should hire his son as an analyst, as

7    an intern/analyst.

8    Q.  And that's after you left Moscow, correct?

9    A.  Correct.

10   Q.  You talked a little bit about always engaging separate

11   counsel from Interros, correct?

12   A.  I engaged separate counsel from Interros when we negotiate

13   Altpoint versus Interros matters and in the subsequent motion

14   because of the confidential conflicts, correct.

15   Q.  But initially you engaged Debevoise, correct, as counsel

16   for yourself and Altpoint?

17   A.  Correct, who put together Altpoint's foundation documents.

18   Q.  Right.  And you understood at that time that Debevoise had

19   also represented Interros's and Mr. Potanin's interests,

20   correct?

21   A.  Correct.

22   Q.  In fact, he represented all of Altpoint's -- rather --

23   yes -- all of Altpoint's portfolio companies in connection with

24   1782 proceedings that requested -- similar information has been

25   requested of Altpoint, correct?

F6HAPOTHps                    Aliev - redirect

1   A.  Yes.  Initially we did not think that it was be in conflict

2   retaining the same counsel as we have used for our charter

3   documents and our negotiations with Interros.  That was at the

4   time represented by different counsel.

5   Q.  My question to you, though, sir, was, you understood that

6   Debevoise also represented the portfolio companies of Altpoint

7   in connection with the discovery requests Mrs. Potanina had put

8   forth, correct?

9   A.  Some portfolio companies, correct.

10  Q.  That's right.  In fact, you understood that Mister -- that,

11  rather, Debevoise represented a travel agent in Michigan in

12  connection with Mrs. Potanina's request for information,

13  correct?

14  A.  I actually didn't know that, no.

15  Q.  And did you understand that the portfolio companies did not

16  pay for the legal services of Debevoise?

17  A.  I understand this is not correct.  One of the portfolio

18  companies retained their own counsel and paid for it

19  themselves.  And I believe two others that were subpoenaed,

20  Debevoise was their counsel.

21  Q.  And those two companies, do you know who paid their legal

22  fees, the Debevoise legal fees?

23  A.  I don't know whether there was any netting with portfolio

24  companies.  I don't know.

25  Q.  You simply just don't know.

F6HAPOTHps                    Aliev - redirect

1   A.   Correct.

2   Q.   You talked a little bit about being kind of unknown at

3   Interros, correct?

4   A.   People at Interros in general don't know what I look like

5   or who I am unless they look at the website.

6   Q.   So Interros does hold you out as a representative of the

7   company, correct?

8   A.   Interros displays my picture in alphabetical order on their

9   website.

10   Q.   And I would draw your attention to petitioner's exhibits,

11   and in particular Exhibits B, C, D, and E.

12   A.   Joint Exhibits?

13   Q.   No, these are petitioner's exhibits.

14            THE COURT:  They are in the other little book.

15   Q.   Have you seen those documents before, sir?

16   A.   I have as part of this motion.

17   Q.   And understood that this information appeared on the

18   website of Interros at various times, correct?

19   A.   And I understood that that's what appears on our website

20   right now.

21   Q.   OK.  In fact, Exhibit B, Petitioner's B, you see the date

22   in the upper left-hand corner?

23   A.   B for bravo?

24   Q.   That's correct.

25   A.   Looking at it.

1    Q.  That's from June 4, 2015, correct?

2    A.  Correct.

3    Q.  And Exhibit C is likewise from June 4, 2015?

4    A.  That is correct.

5    Q.  And then if you look at Exhibit D, that's from January 24,

6    2014, correct?

7    A.  That is correct.

8    Q.  And if you look at January, Exhibit D, there are two vice

9    presidents listed in January of 2014, correct?

10           MR. CARDOZO:  Objection, your Honor.  None of these

11   documents are, should be received in evidence.  I think it's

12   inappropriate to ask the witness's these questions.

13           THE COURT:  Counsel?

14           MR. GEERCKEN:  I would have moved for, we move for

15   their admission into evidence.  And I think the witness has

16   authenticated the documents, saying that they appeared on the

17   Interros website, and the case law, I think, is very

18   straightforward; if it's authenticated, it should come in as

19   evidence.

20           MR. CARDOZO:  The document may appear on its website.

21   It doesn't mean that they are being offered for anything other

22   than the fact that it appears on its website.

23           THE WITNESS:  Sir, I looked at --

24           THE COURT:  I'm sorry, sir.  There is an objection.

25           Are you offering them for the truth of the documents?

1            MR. GEERCKEN:  I'm offering them --

2            THE COURT:  Or that they appeared on the website?

3            MR. GEERCKEN:  The latter, your Honor, that they

4     appeared on the website.

5            MR. CARDOZO:  No objection.

6            THE COURT:  Received.

7            (Petitioner's Exhibit D received in evidence)

8     Q.  And there were two vice presidents listed on January 24,

9     2014 in Exhibit D, correct, Mr. Aliev?

10    A.  That's what this printout says.

11    Q.  And by June 4, 2015, now at Petitioner's D there is only

12    one vice president listed, correct?

13    A.  That's what the printout says.

14    Q.  And that's you, correct?

15    A.  Correct.

16    Q.  And Exhibit E, Petitioner's E, you're also listed as the

17    sole vice president, and that's dated October 24, 2014; is that

18    correct?

19    A.  It looks like the exact same printout.

20    Q.  And that date is correct, October 24, 2014?

21    A.  Yes, the same printout.

22    Q.  And finally, Exhibit F of petitioner's book, that is

23    certain biographical information about you dated October 24,

24    2014, correct?

25    A.  Correct.

1           MR. GEERCKEN:  Your Honor, we're offering Exhibits B

2    through G into evidence as stated.

3           THE COURT:  I think you already offered them, and you

4    offered them for the fact that they appeared on Interros's

5    website.

6           MR. GEERCKEN:  Correct.

7           THE COURT:  I thought I accepted them.

8           MR. GEERCKEN:  I just wanted to make sure I got all of

9    them.

10          MR. CARDOZO:  I think Mr. Geercken misspoke when he

11   offered G.  I don't think you have offered G.

12          MR. GEERCKEN:  Forgive me.  It's B through F, so I did

13   get it right.

14          THE COURT:  OK.  Thank you.

15          (Plaintiff's Exhibits B through F received in

16   evidence)

17   Q.  Now, Mr. Aliev, you understood that Exhibit F had been up

18   on the website of Interros for a while, correct?

19   A.  What is it I understand?  I'm sorry?  Your question?

20   Q.  Exhibit F had been on Interros's website for some time,

21   correct?

22   A.  I understood from the printout of today's case that that's

23   the case, correct.

24   Q.  At any time did you ever seek to have your name or your

25   picture removed from the Interros website?

1   A.  Sir, when the first subpoena and the motion was filed, I

2   didn't want to do anything that could have affected -- that

3   could have lead to accusations of interfering with evidence.  I

4   most certainly don't care about what Interros displays on their

5   website.  But I didn't do anything to affect the materials

6   anywhere.

7   Q.  So you never sought to have your name on your image removed

8   from the Interros website, correct?

9   A.  I never have.

10  Q.  Drawing your attention to Exhibit 4-G, can you take a look

11  at that, sir.  That's a Joint Exhibit.

12  A.  Joint Exhibit?

13  Q.  Correct.  Drawing your attention again, this is the

14  supplemental agreement to your employment agreement dated

15  August 2, 2010.  Is that correct?

16  A.  Correct.

17  Q.  And there are certain responsibilities, rights, and

18  obligations of the vice president, and a description of your

19  representative functions described therein, correct?

20  A.  The document speaks for itself.  That's what it says.

21  Q.  OK.  Are you aware of any document that relieved of you any

22  of those functions, rights, or obligations?

23  A.  No.

24          MR. GEERCKEN:  Thank you, your Honor.  That's all I

25  have for now.

1              THE COURT:  Thank you.

2              MR. CARDOZO:  No further questions, your Honor.

3              THE COURT:  All right.  You may step down, sir.

4         Thank you.

5              (Witness excused)

6              THE COURT:  How would you like to proceed now,

7    counsel?

8              MR. GEERCKEN:  Your Honor, since we have the

9    deposition, the other transcript deposition designations

10   already before you, I think it would be appropriate just to sum

11   up.

12             THE COURT:  All right, sir.  How long would you like?

13             MR. GEERCKEN:  I don't think I need more than ten

14   minutes.

15             THE COURT:  Sure.  Go ahead.  Do you need a break?

16             MR. GEERCKEN:  It would be great if I could have just

17   a couple of minutes to gather my thoughts.

18             THE COURT:  Sure.  Five minutes.

19             MR. GEERCKEN:  Thank you, your Honor.

20             (Recess)

21             THE COURT:  Mr. Geercken.

22             MR. GEERCKEN:  Thank you, your Honor.

23        Your Honor, it's been now a full year since you

24   ordered, your Honor ordered Mr. Aliev to produce documents,

25   five categories of documents listed in your order of June 17.

F6HAPOTHps                    Summation - Mr. Geercken

1   Since that time, Mr. Aliev has not complied with the order.  He

2   has sought reconsideration.  And only in that process did he

3   begin seeking information.

4          The new evidence that has been presented since that

5   time is essentially some of the corporate constituent documents

6   of Interros.  They include the charter.  They include the

7   regulation.  And the regulation makes clear, it speaks in

8   mandatory language.  It speaks of rights and obligations of the

9   vice president.  It talks about how he shall represent the

10  company before public authorities, government authorities, as

11  Mr. Aliev said here today.  It says that he shall represent the

12  company in connection with negotiations with major

13  counterparties.

14         It also talks about how he is entitled to get

15  information from Interros employees that are within the scope

16  of his rights and responsibilities.  What Mr. Aliev admitted to

17  here today is that while he contacted Mr. Potanin and then he

18  contacted management, he did not raise with them at any time

19  the rights and obligations that he had under the regulation.

20  Nor did Mr. Potanin or Ms. Zakharova or Mr. Barbashev ever

21  specifically reference the regulation and take issue with it.

22  Instead, he -- and he also didn't seek any independent advice

23  of counsel shall Russian counsel, with respect to the issue,

24  until he finally had a Russian expert bring up the regulation

25  issue.

F6HAPOTHps                    Summation - Mr. Geercken

1          Mr. Aliev also admits that he had a social

2    relationship with Mr. Potanin and was friendly with him, even

3    hired his own son, Mr. Potanin's own son to work with him, at

4    Mr. Potanin's request.  Predictably, by virtue of this

5    relationship and by virtue of understanding the dynamic between

6    Mrs. Potanina and Mr. Potanin, he well knew what the response

7    would be in regard to his request for information.

8          The other significant evidence that's been adduced has

9    been the evidence through the experts that have testified by

10   way of deposition in this matter.  All of the experts agreed

11   that the regulation, Article 22 of the Russian Labor Code, and

12   the charter are the constituent documents, and the agreement,

13   the labor agreement between Mr. Aliev and Interros are the

14   constituent documents from which his rights and obligations

15   arise.  All the experts agree, Mr. Aliev agrees, his

16   contractual relationship with the company has not been

17   terminated.  Although his salary has been reduced over time,

18   Mr. Aliev acknowledges that he was the one that wanted to keep

19   the title and retain a position with Interros.

20         And that had a value to it.  His own expert agreed

21   that reduction of salary did not and should not affect the

22   responsibilities and obligations of a vice president under

23   Russian law.  His own expert agreed that if Mr. Aliev were to

24   be given a project or if he were involved in a project, he

25   would have access to and could have access to non-public

1   confidential information, under certain circumstances.  The

2   expert of Mr. Aliev also does not take issue with the

3   conclusion of petitioner's expert that one of Aliev's job

4   functions as a vice president is to represent Interros before

5   public authorities such as U.S. courts.  And Mr. Aliev, by

6   virtue of receiving a subpoena and being party to this matter,

7   had the obligation under the regulations to represent Interros

8   and to respond.

9        Now, much is made about the regulation.  At some point

10  Mr. Aliev equivocated.  First he said the language shouldn't

11  have been "shall" perform certain functions, rather, "is

12  directed to."  And at one point he said "can."  But there has

13  been no objection to the translation that has been provided by

14  any expert.  And the regulations on their face speak of

15  mandatory rights and responsibilities, one of which is the

16  right to receive documentation that would be required for a job

17  function.

18       We discussed earlier, your Honor, some of the case law

19  that does not relieve a party or a non-party from producing

20  information just because the company that has direct ownership

21  of it doesn't want them to.  We talked about the *IBM* case.  We

22  have not found any further information on that.  We talked

23  about petitioner's, or, rather, Mr. Aliev's counsel's reference

24  to the *Shcerbakovskiy* case.  And in that case there was

25  subsequent history.  That case was remanded, and upon remand it

F6HAPOTHps                    Summation - Mr. Geercken

1    was determined that the finding remained the same, that a

2    sanction was imposed against the plaintiff, who claimed that

3    Russian law precluded him from obtaining and providing

4    information, and the Southern District of New York imposed a

5    sanction of $1.8 million in a default judgment.  And that was

6    later affirmed by the Second Circuit on December 14, 2011, in

7    450 F.App'x 87.

8            So, your Honor, I guess what we're saying to you is

9    that a foreign entity cannot override this Court's

10   jurisprudence.  And efforts by Interros to thwart production of

11   documents, given the record that has presented, given the

12   regulation and the constituent documents, we submit counsel did

13   nothing more than an effort to circumvent or subvert this

14   Court's orders.  And we would respectfully request that the

15   Court compel Mr. Aliev to provide the information that has

16   previously been ordered to be produced.

17           THE COURT:  May I ask you two questions, please,

18   counsel.

19           MR. GEERCKEN:  Sure.

20           THE COURT:  First is a structural kind of

21   burden-of-proof question.  The showing that has been made with

22   respect to the regulation, the employment contract, etc., etc.,

23   certainly suggests that Mr. Aliev has the authority to do what

24   you want, to comply.  Then, in opposition, he comes in and

25   says, for 45 reasons I can't do it.  Then what happens?  So

1    it's like an employment case.  A prima facie case has been

2    made.  The opposition comes in.  Where do you say we are now on

3    the burden of proof?

4              MR. GEERCKEN:  I think where we were on the burden --

5    and I'll try and think it through with you out loud here, your

6    Honor -- is that they came forward with certain evidence and

7    affidavits for the first time, after two of your Honor's

8    orders, and claimed, Mr. Aliev claimed what had been claimed

9    before: I just can't get the information.  I think that was new

10   evidence that you considered.  And then you said, OK, I'll

11   grant the motion, I want to have an evidentiary hearing.  I

12   think the burden then was, did this new information -- well, I

13   guess the burden was on us, I will assume that burden, to show

14   control, either legal control or ability to access the

15   information in question.

16             And I believe that where we are right now is that

17   we've taken discovery on this, we've obtained the documents,

18   and we've heard from experts, and we've shown that, at a

19   minimum, that he has the legal authority to obtain this

20   information by virtue of his title and by virtue of the

21   documents, the constituent documents of the company.

22             THE COURT:  I probably agree with you on that.  But

23   I'm asking you where we are now.  You have now come in and

24   said, assuming -- I don't think you said this -- but assuming I

25   have the legal authority, I simply can't do it.

1         MR. GEERCKEN:  Well, I think you can, your Honor --

2         THE COURT:  Mr. Aliev said, I simply cannot do it for

3    all these thousands of reasons.

4         MR. GEERCKEN:  Right.

5         THE COURT:  So where does that leave us, then, in

6    terms of burden of proof?

7         MR. GEERCKEN:  I think that leaves you in a situation

8    where you have to weigh the credibility of the excuses that

9    were made and of Mr. Aliev and the other evidence that was

10   presented before you.  And I think if you come to the

11   conclusion that we are correct that he has the authority and

12   ability under the regulation --

13        THE COURT:  Which are two things, authority and

14   ability.

15        MR. GEERCKEN:  Right.

16        THE COURT:  And he's saying, I don't have the ability.

17        MR. GEERCKEN:  That's right.  It's an either/or test.

18   And we believe that we've shown the legal authority.  It's

19   difficult for us at this point to give you anything more on the

20   ability issue, other than the testimony that we've heard from

21   his expert this said, yes, if there were a new matter that came

22   up, even he agreed that he would likely have, or I guess his

23   language was, he would possibly have to obtain other non-public

24   information and would have the right to access that information

25   under the right circumstances.

F6HAPOTHps                    Summation - Mr. Geercken

1          So that's we are on the ability prong.  On the legal

2     authority prong I think we're really strong.  And the rest is,

3     I think, a decision point for you.

4          THE COURT:  Let me ask you a factual question.  At

5     some point just now you said that when Mr. Aliev asked

6     Mr. Potanin for the documents, he well knew what the answer was

7     going to be.  Given the relationship here, I think, what if

8     Mr. Potanin decided, I am shutting this thing down, I don't

9     care about his legal authority, I don't care, I am not turning

10    these documents over, I'm not letting anybody under my control

11    turn these documents over?  Then where are we on the ability

12    prong?  I'm not so sure that even you think it's farfetched

13    that Mr. Potanin would have done such a thing.

14         MR. GEERCKEN:  Of course it has crossed my mind, your

15    Honor.

16         THE COURT:  I imagine.

17         MR. GEERCKEN:  And it's a difficult issue.  But I

18    think that the ramification of that, or the potential

19    consequence is that foreign parties will try and take action to

20    thwart court orders, and they will say, you know, by virtue of

21    what we have done, there is no, you know, the court order in

22    the United States will have no effect on you even though you,

23    non-party or third-party witness, are subject to the

24    jurisdiction of the court.

25         THE COURT:  I get that.  But obviously the

1   complicating factor in this case that we don't see in most

2   cases is that Mr. Aliev's position, which you say gives him

3   access, is also a position in the opponent company, more or

4   less, right?  That is the complicating factor that we don't see

5   in many of the cases, or any of them, as far as I can tell.

6   And so I ask you -- you're welcome to comment on that.  But

7   then the question is, what happens next?  Let's say the order

8   is reissued, Mr. Aliev, you have to turn this stuff over, he

9   doesn't, then you fine him for a while, then we put him in the

10  MCC for a while, and meanwhile, Mr. Potanin is sitting there

11  and saying, well, I don't know, too bad, you know, I'm not

12  turning over the documents.  How does the coercion, which civil

13  contempt generally is intended to effect, how does it work in

14  this case, where we have an actual party opponent in the

15  underlying action in charge?

16          MR. GEERCKEN:  It's a situation where, you're right,

17  where we have the party opponent in charge.  Mr. Potanin pulls

18  all the strings.  He has sent the vice president here in the

19  United States, and is trying to avoid consequences.  But I

20  guess, if the sanction affects Mr. Aliev and his ability to

21  perform services here, at some point, it is negatively

22  impacting Interros's interests in the United States.  And that

23  is the lever that could compel Mr. Potanin and Interros to

24  comply.  And we won't know that until we follow through.

25          The easy way out, your Honor, I'll acknowledge, is,

1    looks like he can't do it, and, you know, sorry about that.

2    But I believe the jurisprudence -- we're in a court of law and

3    we should proceed.  After we have made this showing, I think

4    your Honor has the authority and in fact under the

5    jurisprudence would be required to reissue the order, and issue

6    some form of compulsion, and see where that takes us.

7            THE COURT:  Well, the normal progression, I guess,

8    would be, after a finding, lock them up, and then generally I

9    think it's about after 18 or 24 months, a civil contemnor may

10   come back to the court and say, see, I told you it wasn't going

11   to do any good, now you need to let me out.  And I think the

12   Second Circuit does require us to do that.

13           MR. GEERCKEN:  And that may be the case.  But I don't

14   want to short-circuit the process, your Honor.  I understand

15   it's a difficult dynamic that we're dealing with here today.

16   But, again, I come back to the jurisprudence and what we have

17   shown, and I think the process should play out further, to see

18   if we can -- because we don't think he's done everything he can

19   do.  He hasn't sought -- one of the things that Mr. Kulkov, our

20   expert, talked about was, it may be a suit, maybe it's a

21   regulatory fine.  Maybe there's other negotiation that

22   Mr. Aliev can engage in.  And I think a reconfirmation of your

23   order will encourage, at least Mr. Aliev, to pursue these

24   options.  And Mr. Potanin will recognize that a key

25   representative in the United States will be hampered in his

1    other duties for him.  And that may result in, you know, the

2    production of the information that is required.

3           THE COURT:  Your position is, put him in so he can't

4    manage the money.

5           MR. GEERCKEN:  Well, I wouldn't -- I'm not saying

6    immediately.  I'm saying that if there is some other form of

7    sanction, a monetary sanction that could begin at first, I

8    think Mr. Aliev would take some other action.  Certainly we

9    would have more communication.  And if it did come to pass that

10   the Court and we are stonewalled again, I think that, you know,

11   mandatory detention could be an option.

12          THE COURT:  All right.  Thank you.

13          MR. GEERCKEN:  Thank you, your Honor.

14          THE COURT:  Mr. Cardozo.

15          MR. CARDOZO:  Thank you, your Honor.

16          First of all, with respect to the burden of proof

17   issue, it seems to me that the question at the moment is,

18   should you order production of these documents.  It's as

19   though -- we all know the procedural history of this case --

20   but it is as though this motion was made, you did grant our

21   motion for reargument, and therefore the burden remains on the

22   petitioner to show that we have, that Mr. Aliev has access and

23   control.  That's the burden.

24          Now, assuming that is correct, the facts here really

25   are not in dispute.  I don't think there is any challenge to

F6HAPOTHps                    Summation - Mr. Cardozo

1    the fact that for the last five years Mr. Aliev has not done

2    anything for Interros, after that Rosbank situation.  No

3    question that he remains a signatory to the employment

4    agreement.  No question he hasn't received a salary since that

5    time.  I don't want to repeat all of that.  No question that

6    Interros is an important client.  No question that over 67,000

7    pages of documents have been produced in response to this

8    subpoena, many from Altpoint and some from Mr. Aliev's personal

9    account.  There is no question about any of that.

10          So before I get to the dispute over the experts and

11   what the meaning of the regulation is, what does the case law

12   say about this?  I go back to Judge Chin's opinion.  The guy

13   asked and asked and asked, and the person he was trying to get

14   the documents from said, no, no, no, and Judge Chin said,

15   nothing more I can do.  The case that Mr. Geercken mentioned

16   was a case where the person they were trying to get the

17   documents from was a 40 percent owner of the company.  We don't

18   have that situation here.  No question that Altpoint and

19   Interros are separate companies.  No question that there is an

20   important relationship there.  But that doesn't constitute

21   control, as a matter of U.S. law, before I get to the Russian

22   law.  The cases say you have to look at the facts.  If this was

23   a subsidiary-parent situation, it doesn't ipso facto follow

24   that the sub has control over the parent.  You have to look at

25   the underlying facts.  And I think we've heard the facts here

1    are that there is simply no relationship that you can use to

2    get these documents.  It's unfortunate, perhaps, that he

3    doesn't know anybody other than the top people at Interros.

4    But that's a fact.  I don't think there's any dispute about

5    that.

6           So what is it that changes the fact that there's no

7    showing at all that he can get the documents?  That gets us to

8    the question of Russian law.  And I'm sure your Honor will

9    study the reports and depositions of the two experts.  Their

10   expert says, I don't think it's a question of whether the

11   translation of the Russian regs was accurate or not, I think

12   it's a question of, what do those regs mean?  Do they mean you

13   must represent the company before public authorities or what

14   have you, or that you can represent?  Yes, it says "shall."

15   That's what it says.  Our expert says that means that if you

16   are asked to, for example, represent a company before public

17   authority, Article 22 of the Russian labor law requires that

18   the company give you the documents in order to carry out the

19   job they ask you to perform.  But our expert says, if they

20   never ask you to do that, even if the reg says you can do it,

21   you don't have a right to demand the documents to perform a

22   function that the company has not asked you to perform.

23          And I call your particular attention to paragraph 27

24   of our expert's report and pages 99 to 93 and 106, in which our

25   expert -- I don't need to go through the preceding

1    qualifications -- our expert says these regulations mean you

2    can do that, you are authorized to do these functions, but you

3    are not entitled to the document unless you are asked to

4    perform the function.  And he has not been asked to perform the

5    function.  I don't think anyone disputes that.

6            Their expert says, no, no, no, I admit, he says, on

7    pages 60 to 62 of his deposition, I've seen no evidence that

8    Mr. Aliev performed any of these functions, I admit that.  But

9    he says that's irrelevant.  He says, on page 62, even though he

10   has done none of these functions for the last five years, he

11   still has the right to get those documents.  That's a legal

12   question under Russian law.  We have competing experts on that

13   point.

14           So then the question remains, which is the last series

15   of questions I think you were asking Mr. Geercken, what else

16   should he do?  How does he get the control?  How do you get

17   these documents?  We have a fact.  Has the petitioner satisfied

18   her burden of proving that he has control over these documents,

19   based upon the evidence you've heard?  I submit to you, your

20   Honor, that he clearly does not.  You don't put someone in jail

21   to say, well, maybe the facts will change if someone is in

22   jail.  The fact is, he called the people he knew, the people he

23   dealt with.  The expert says he should have called an IT -- the

24   expert who read his deposition, Mr. Aliev's deposition -- said

25   he should have called the IT department.  There's nothing he

1    could have done there.  So how can you order him, put him in

2    jail until he calls the IT department, that he doesn't know, or

3    to say, gee whiz, I hope that maybe Mr. Potanin will have a

4    little sympathy for Mr. Aliev when he sees he's in the

5    Manhattan detention center.  That's not what the law is.  You

6    don't do that.

7         He tried every possible way to get these documents.

8    Their expert says, well, he should have sued.  I think that's

9    another legal question for you.  And I submit to you, your

10   Honor, it's one thing under 1782 to say you've got to pull out

11   the stops, go to Russia, ask for the documents; it's another

12   thing for a third party to have to go to the expense of hiring

13   a lawyer in Russia and arguing a case which his expert says

14   you're going to lose.  That's not what the law is.

15        And then I will just suggest this.  There are

16   proceedings pending in Russia brought by Mrs. Potanina against

17   Interros and various other companies.  I'm not familiar with

18   the names.  They obviously relate to the divorce and the asset

19   issue.  I'm not familiar with the nature of those proceedings.

20   But before someone can be ordered to bring a lawsuit in Russia

21   to help Mrs. Potanina get documents, the question certainly

22   arises, why isn't Mrs. Potanina doing that?  And the

23   interpretation that we urged here is that in a 1782 proceeding,

24   the individual has to go to the foreign country, bring a

25   lawsuit, if he or she wins, bring the documents back to New

F6HAPOTHps                    Summation - Mr. Cardozo

 1    York to produce in response to the 1782 subpoena, to give the

 2    documents to go back to Russia.  That makes no sense, your

 3    Honor.  I'm sorry that Mrs. Potanina is in this situation.  But

 4    it is totally inequitable to suggest that my client has to go

 5    to that expense and trouble.  And it would be pretty ironic to

 6    say the least if Mrs. Potanina can't get these documents from

 7    Russia, but my client should?  And give them to her?

 8             So I come back to the underlying issues that I would

 9    ask you to think about.  Number one, Russian law does not

10    require Interros to give him these documents, because he has

11    not been asked to perform a task.  That's a critical fact,

12    number one.

13             Critical fact number two is, under U.S. procedural

14    law, you have to show that he has an ability to get the

15    documents.  And the only ability that has not been exhausted is

16    for him to bring a lawsuit in Russia.  There is no case that we

17    have had that suggests that under 1782, the ultimate extreme is

18    to order the respondent to bring a lawsuit in a foreign

19    country.  It's one thing, as you said *Microsoft* case, to order

20    someone -- and I understand that is not a 1782 proceeding --

21    it's one thing to order someone to go, push the button on the

22    computer and the like.  Quite another thing to order him to

23    bring a lawsuit.

24             THE COURT:  Does the record reflect that Mrs. Potanina

25    is in fact suing Interros in Russia?

F6HAPOTHps                        Summation - Mr. Cardozo

1              MR. CARDOZO:  We have listed as an exhibit the only

2      thing we could get off of a website, equivalent of a website --

3              THE COURT:  They don't have Pacer?

4              MR. CARDOZO:  For some reason Pacer hasn't reached

5      Russia yet.  And we're also told, your Honor, that we can't get

6      the underlying papers in the case.  We did through our

7      expert -- I really can't --

8              THE COURT:  I have it all memorized but maybe you

9      could refresh my recollection.

10              MR. CARDOZO:  There are various proceedings and a

11      court hearing, according to, I think it's Google, to the CNN

12      report, that she has a July 1 preliminary hearing in Russia on

13      these cases.  I don't want to represent to you that I know --

14              THE COURT:  Counsel has stepped up to help you out.

15              MR. CARDOZO:  It's Respondent's Exhibit L, your Honor.

16              THE COURT:  Apparently the people assisting us are on

17      top of it.

18              MR. CARDOZO:  Fortunately for me I have two

19      outstanding assistants, your Honor.

20              THE COURT:  And I have an equally outstanding law

21      clerk.

22              MR. CARDOZO:  Thank you.

23              There is a translation, your Honor, on the

24      second-to-last page, and you will see that defendant, the

25      fourth from the bottom, ZAOHC Interros.

F6HAPOTHps

1              THE COURT:  Yes.

2              MR. CARDOZO:  Again, I don't want to mislead the

3      Court.

4              THE COURT:  Plaintiff, is that Mrs. Potanina?

5              MR. CARDOZO:  Yes.

6              THE COURT:  Thank you.

7              MR. CARDOZO:  So I would just conclude that to suggest

8      that we should close our eyes to the reality and say, well,

9      maybe if we put him in jail, then Mr. Potanin will feel sorry

10     for him, that's not the law.  He has done everything he

11     possibly could, and the motion should be denied.

12             THE COURT:  All right.  Thank you.

13             Mr. Geercken, is there anything you wanted to add?

14             MR. GEERCKEN:  I just wanted to add a couple very

15     quick points, your Honor.

16             THE COURT:  Yes, sir.

17             MR. GEERCKEN:  We heard a lot about proceedings in

18     Russia.  And we talked about this at the very instant when we

19     brought these proceedings.  The reason we brought these

20     proceedings, and we laid it out in our papers, is that we can't

21     get access to all the information in Russia, even if Interros

22     is a party.

23             Now, this action, the first time we saw that document

24     from opposing counsel was a few days ago, but we understand

25     that there is an action pending.  We understand that discovery

F6HAPOTHps

1    is not permitted against Interros.  That's the communication

2    that we've received from our counsel.  But be that as it may,

3    that's not the test.  As your Honor noted in the June 17th

4    order, the Second Circuit has refused to graft the exhaustion

5    requirement onto Section 1782.  That would force litigants to

6    seek information through foreign or international tribunals

7    before requesting discovery from the district court.  And it's

8    the *Euromepa* case that is cited as support for that.  So I

9    don't believe that that is a relevant point at all here, your

10   Honor.

11        Mr. Cardozo talks a little bit about, we have

12   competing experts.  There are some clashes of the experts.  But

13   we have no challenge and we have no dispute to the language of

14   the regulation or the contract.  That is clear and that is in

15   the record.  We also have both experts testifying as to what

16   that means.  We also have the public authority issue, that the

17   regulation requires him to represent Interros before public

18   authorities.  There has been no objection or challenge to that

19   testimony in paragraph 22 of Mr. Kulkov's report or in the

20   corresponding deposition testimony he gave on that issue.

21        So I think, your Honor, it's an either/or test.  It's

22   not a conjunctive test.  Rather, it is legal authority or the

23   ability.  If we show either one, we have a right to the relief

24   we seek.  And I'd rather not have the Court and we close our

25   eyes to the realities of the jurisprudence and just try and

F6HAPOTHps

1    seek an expedient way out that benefits Mr. Aliev because

2    Mr. Potanin has said, no, I'm not going to give you this

3    information right now.  We are not advocating for him to go

4    immediately into detention.  We think that there are other

5    levers that the Court can pull, monetary sanction, and then

6    after that there may be further increasing in the sanction to

7    compel compliance.  And we think that the relief we are

8    requesting is warranted here.

9              THE COURT:  Thank you.

10             MR. GEERCKEN:  Thank you, your Honor.

11             THE COURT:  Just a question, Mr. Cardozo:  Do you

12   agree with counsel that legal authority *or* ability is required,

13   one or the other?

14             MR. CARDOZO:  No, I do not, your Honor, because you

15   can have every legal authority in the world, but if there is no

16   ability to execute on that legal authority, then someone can be

17   in the slammer forever because he has the theoretical right to

18   do something that he can't -- there's no one to dispute that he

19   can do.

20             So this theory is great.  But let's think -- and you

21   suggested in your January opinion.  If you order him to produce

22   these documents and he does not and you enter a contempt

23   finding, and then we're going to have a hearing on contempt,

24   where the burden of proof is a different one, how can you find

25   that you have an increasing set of sanctions or jail or

F6HAPOTHps

1    whatever it would be, when there's nothing more he can do?

2    That's not what the law is.  I don't agree with that.

3            The other point I just wanted to make, as far as a

4    pending Russian proceeding, is that the Second Circuit in the

5    *Shcerbakovskiy* case does say that the respondent in a -- it

6    wasn't a 1782 proceeding -- but if there's a way for the person

7    who is actually seeking the documents to get the documents,

8    then that should be step one.

9            Now, I don't know whether Mrs. Potanina can get the

10   documents in Russia or not.  I'm not suggesting I do.  But

11   there's no way to do it.

12           And the final thing I'd like to say is, I think

13   Mr. Geercken misspoke with respect to the disagreement on

14   experts.  Our expert said, if he was asked by Interros to

15   represent them before public authorities, then he has a right

16   to get the document to represent him before public authorities.

17   But he has not been asked to represent them before public

18   authorities.  He has never been asked to represent them before

19   public authorities.  And so our expert says, therefore, he is

20   not entitled to these documents.

21           THE COURT:  But that's a difference between the two

22   experts.

23           MR. CARDOZO:  That's right.  But I just take issue

24   with the question that our expert concedes.  Because I think

25   we're back to the same issue as to, has he been asked.

F6HAPOTHps

1          I thank you, your Honor, for your time.

2          THE COURT:  Anything else?

3          MR. GEERCKEN:  Your Honor, just on the either/or test,

4    I think this *Viva* case that we cited, 2009, WL 529224 (Southern

5    District February 17, 2009), addresses that.  I think there are

6    our cases that we've cited.

7          THE COURT:  Thank you.

8          MR. CARDOZO:  I just again cite the Denny Chin case

9    that we've discussed with you, your Honor.

10          THE COURT:  All right, counsel.  Thank you so much.

11    Reserved.

12          MR. GEERCKEN:  Thank you, your Honor.

13          THE COURT:  Thank you for being so prompt.

14                            o0o

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    GUERMAN ALIEV

4    Direct By Mr. Geercken . . . . . . . . . . . .17

5    Cross By Mr. Cardozo . . . . . . . . . . . . .69

6    Redirect By Mr. Geercken . . . . . . . . . . 101

7                        RESPONDENT EXHIBITS

8    Exhibit No.                                 Received

9     J   . . . . . . . . . . . . . . . . . . . . .77
      K   . . . . . . . . . . . . . . . . . . . . .77
10    A, B, C, and I . . . . . . . . . . . . . . .83
      H  . . . . . . . . . . . . . . . . . . . . 101
11                        JOINT EXHIBITS

12   Exhibit No.                                 Received

13    17   . . . . . . . . . . . . . . . . . . . .85
      5  . . . . . . . . . . . . . . . . . . . . .97
14       . . . . . . . . . . . . . . . . . . . . .99

15                       PETITIONER EXHIBITS

16   Exhibit No.                                 Received

17    D   . . . . . . . . . . . . . . . . . . . 107
      B through F   . . . . . . . . . . . . . . . 108
18

19

20

21

22

23

24

25
```